## MUNGER v. PERLMAN RIM CORPORATION.*

(Circuit Court of Appeals, Second Circuit. June 1, 1921.)

No. 242.

1. Patents ⊕⇒328—638,588, for demountable rim for automobile tires, held valid and infringed.

The Munger patent, No. 638,588, for means of attaching automobile tires to the rims, claim 4, held valid and given the broad construction to which it is entitled, as covering the principle of wedge action for fastening a demountable rim, infringed.

2. Patents ⊕⇒319 (1)—Reasonable royalty to be paid by infringer determined.

Where it was determined that a patentee of an automobile part was entitled to damages for infringement, measured by a reasonable royalty, such royalty held properly based on a percentage of the sale price of the infringing part in conformity with the custom of so fixing royalties for similar patented parts.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in Equity by Louis De F. Munger against the Perlman Rim Corporation. Decree for complainant, and defendant appeals. Modified and affirmed.

See, also (D. C.) 244 Fed. 799.

Suit is upon patent 638,588, for which application was filed April 25, 1899, patent issued December 5, 1899, to National Wheel & Traction Company as assignee of the inventor, who is the plaintiff herein.

The disclosure of the specification is for an improvement in "cushion-tires" for vehicle wheels, the object being "to provide an improved means of attachment of the tire to the wheel rim or felly, and specially designed for the driving wheels of automobiles." It is admitted that the specification reveals two entirely distinct thoughts—one for securing the pneumatic tire to its base by vulcanization, the other for the means of attaching said tire base to the wheel proper.

The only claim in suit is No. 4, which deals with the last alleged inventive thought, and reads as follows: "In combination with a tapered felly, a tire, an annular rigid base to which said tire is secured, said base having a tapered under-surface and fitted on said felly, substantially as described."

The description referred to is of a "felly slightly inclined or at an angle with the axle, the outer diameter of the wheel being the smaller to form a tapering fit for the tire base." As shown, the tapered felly fits within a similarly tapered tire base, to the end that "the larger circumference of the base can be easily slipped over the small outer circumference of the felly." It is then stated that "when in place these wedge-shaped surfaces form a close fit and also resist any tendency of further inward movement of the band on the felly due to strain on the tire in turning corners."

The tapered or frustro-conical tire base when placed over the similarly shaped felly, is not only locked in position but pressed into further wedge-like relation to the felly by bolts passing through said felly substantially at right angles to a spoke and with an extension or lug (integral or detachable) bearing upon the outer surface of the tire base; the entire bolt and lug being tightened with a nut so as to press (if necessary) the tapered tire base further on the similarly tapered felly.

Of this construction it is said that when the securing bolts are loosened it is only necessary in removing the tire base "to back off the base slightly from the felly, when it can be easily slipped down off the inclined surface."

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 256 U. S. ——, 42 Sup. Ct. 54, 66 L. Ed. ——.

Under the assignment above referred to, National Wheel & Traction Corporation remained the owner of record of this and other patents of Munger's until September 5, 1916, when it assigned said patents to the plaintiff herein by a transfer duly recorded. It is upon this title that plaintiff brought suit.

In July, 1902, however, an assignment of the patent in suit (and others) was drawn and executed by the National, etc., Company to a New Jersey corporation known as "Munger Automobile Tire Company." This assignment was delivered to the attorney for the men who had agreed to finance the then newly created Munger, etc., Company, and who causd the incorporation of that company.

This corporation commercially manufactured under Munger's tire patent; but the business lasted only a few months. It is evident that there were disagreements, if not quarrels, between this plaintiff and the men who were to furnish capital for the new corporation bearing plaintiff's name. Such disagreements quickly produced insolvency proceedings in the chancery of New Jersey (in October, 1902).

The receiver sold out the effects of the Munger, etc., Company, but never specifically sold the patent or patents covered by the assignment of July, 1902, until September, 1917, about a year after the beginning of this suit. Between 1902 and 1917 the assignment from National, etc., Company to Munger, etc., Company remained in the possession of the attorney for the financial backers of Munger, etc., Company, who (as found below) never fulfilled the promises of financial aid or working capital made by them to National, etc., Company and Munger when the project was formed that took shape in the incorporation of Munger Automobile Tire Company, the concern which they themselves promptly put into insolvency.

In 1917 defendant herein in effect acquired by formal conveyances from the receiver and purchasers at the receiver's final sale of 1903 (who apparently had never seen or heard of the patent) whatever paper rights to the patent in suit were or had been of the Munger Automobile Tire Company of New Jersey, whereupon by leave of the District Court the defense was presented that plaintiff had no title to the patent in suit.

The alleged infringing article is a now familiar form of demountable motor rim, and may be described in language taken from the decision of Hunt, C. J., in Perlman v. Standard Welding Co. (D. C.) 231 Fed. 453, affirmed 231 Fed. 734, 146 C. C. A. 18.

Defendant's demountable rim is of the clincher type, and is in effect provided with a block, or stop, so that it will not creep. Each of the locking devices consists of a bolt and a metal wedge. The wedges go between the demountable rim and the fixed rim (or felly), and exert an inclined pressure upon the demountable rim radially away from the wheel body, spacing it from the fixed rim, and also press it laterally against the flange at the other end of the fixed rim; the wedges used by defendant are propelled by means of threaded bolts. (D. C.) 231 Fed. at page 455.

The court below found that defendant's alleged infringing article was manufactured under a patent owned by it, No. 1,052,270, being the same patent which was considered and interpreted in this circuit in the cases above referred to. It was further held that the patent in suit should not be "restricted to the precise relation of the wedge elements shown" therein, but should be so construed as to "include within its scope the obvious equivalents." It then declared that defendant's structure "performs its function in practically the same way as the patented" one, and therefore decreed infringement.

Pending trial, however, plaintiff's patent had expired, whereupon (no injunction issuing) it was decreed that plaintiff "recover from * * * defendant, a reasonable royalty on all demountable rims manufactured, sold, or otherwise disposed of by said * * * defendant in this cause in infringement of (said claim 4 of the patent in suit), as damages for such infringement."

The ascertainment of these damages was sent to a master, who under the form of decree quoted from had no power to do more than ascertain damages.

by ascertaining the proper royalty upon Munger's invention. No exception has been taken to this limitation upon the master's power. That official reported: (1) That defendant corporation was liable only for such infringements as it had committed from the date of its incorporation April 6, 1916, to the date of the expiration of the patent in suit—i. e., December 5, 1916—(2) that during that time defendant had either manufactured or sold, or both, 348,568 infringing rims or tire bases; (3) that a reasonable rate of royalty for the use of the invention of the claim in suit is $.2096 per rim; (4) wherefore, after making certain deductions, plaintiff should recover as the reasonable royalty aforesaid $73,070.08—for which amount, with interest from the date of the master's report and costs, final decree was entered, and defendant took this appeal.

Melville Church, of Washington, D. C., and John Thomas Smith, of New York City, for appellant.

William B. Greeley and Ambrose L. O'Shea, both of New York City, for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges

HOUGH, Circuit Judge (after stating the facts as above). This appeal presents three questions: (1) Has the plaintiff title to the patent in suit? (2) Is claim 4 valid and infringed? (3) Have the damages been properly adjusted?

The question of title depends solely on whether the delivery of the written assignment of the patent in suit to the attorney for the promoters of Munger Automobile Tire Company was absolute or in escrow. Plaintiff contended that it was merely deposited with the attorney in question until such time as his clients produced the money they had promised to provide for the new corporation. It is plain that they never provided the money.

It is not doubted that an escrow is a written instrument, which by its terms imports a legal obligation, and which is deposited by the grantor with a third party to be kept by the depository until the performance of a condition or the happening of a certain event, and then to be delivered over to the grantee. 10 R. C. L. 621.

Undoubtedly there was much to be said in favor of interpreting a deposit with the promoters' attorney as a delivery to the promoters, yet it was and remained wholly a question of fact whether there ever was a delivery or merely a deposit in escrow. The trial judge considered this question of fact on a record containing the testimony (so far as we can see) of every living person who could have had knowledge in the premises, and after such hearing decided that there was a deposit in escrow, and that the condition upon which delivery depended had never been fulfilled. We are not disposed to disturb these findings of fact, and it is not denied that from them flowed the conclusion of law that title to the patent never passed out of the National, etc., Company, as whose assignee the plaintiff brings this suit.

[1] The trial court found as a fact that defendant's rims were made under the Perlman patent so fully considered in this circuit in Perlman v. Standard, etc., Co., supra. This statement is true in a strictly legal sense, but it is also true that what this defendant has made and is making is in substance or essence the device which was

found to infringe in Perlman v. Standard Co., supra. This means that the scope accorded Perlman patent 1,052,270 was so broad that it covered a style of demountable rim very much better for commercial purposes than anything disclosed by Perlman's specification.

Perlman's disclosed means consist essentially in a plurality of threaded bolts passing through the felly at appropriate intervals, having frustro-conical heads, which can be "set up" by nuts, into apertures in the rim or tire base, which base fitted loosely over the felly. By the wedge-action of these frustro-conical bolt-heads the tire-base is to be held firmly in position. The wedge-action held to be a mechanical equivalent is set forth in (D. C.) 231 Fed. at page 455, and is mechanically identical with what is now said to infringe Munger's patent. Throughout the Perlman litigation, supra, the patent now in suit was not cited or referred to. It is a necessary inference from our previous decision, and is abundantly proven here, that wedge-action for the purpose of tightly fastening a demountable rim was broadly new when Munger filed his application.

The references now introduced were disposed of by our previous decisions; they are assuredly no better as against Munger than they were against Perlman. The difference between Perlman's disclosed device and that which was held to infringe in the case cited was in the method of applying wedge-action, but the devices of both parties applied wedges at certain predetermined points on the periphery of the felly, whereas Munger makes of the whole of his tapered rim one wedge when it is slipped over and pressed upon the similarly tapered felly. If, as we have held, wedge-action in this art was broadly new, it makes no difference that instead of a half a dozen wedges Munger has one large wedge.

It is objected that Munger's device was not operative, but the evidence proves that it was used and that it did operate in accordance with the law of its being as described and claimed. That it was not a commercial success is true, as the story of sales shows. But neither was Perlman's disclosed means successful, yet his concept of wedge-action seemed so new and meritorious, as to entitle him to dominate, and (in the person of the defendant corporation bearing his name) ultimately appropriate, the superior application of wedge-action practiced by the defendants in the original Perlman litigation, supra.

The Munger patent is entitled to the same broad scope, because it is a still earlier concept of wedge-action, operative and useful even though not commercially successful. As we have held that wedges driven in between felly and rim must pay tribute to one who described only wedge bolts protruding through the felly (the claim being sufficiently broad), so must the same successful device pay tribute to Munger's earlier wedge-action device.

[2] The interlocutory decree (as interpreted by the opinion below) substantially held that this plaintiff was not entitled to profits; and that since there was not and never had been any established license rate under Munger's patent, and there was no adequate basis for an assessment of damages on lost sales, the master was told to assess damages by ascertaining "what would have been a reasonable royalty, consid-

ering the nature of the invention, its utility and advantages, and the extent of the use involved." Dowagiac, etc., Co. v. Minnesota, etc., Co., 235 U. S. 648, 35 Sup. Ct. 221, 224 (59 L. Ed. 398). No assignment of error challenges this limitation on plaintiff's recovery, and we express no opinion on this point. The only question before us is whether, assuming plaintiff to be entitled to any damages, the ascertainment and computation thereof was correct.

Plaintiff proved that defendant under the Perlman patent had an established or usual royalty charge; that there were many patents covering parts of or devices used in motor vehicles, and that for them rates of royalty had been and were being charged, based upon a percentage of the sale prices of the part or devices containing said patented invention. Then a witness, apparently disinterested, a pioneer in motor exploitation and himself an inventor and manufacturer, gave it as his opinion that from 10 per cent. to 15 per cent. of the sale price of infringing rims would be a reasonable royalty for the use of Munger's invention. There was substantially no evidence in contradiction of the foregoing. Under the Dowagiac Case we think this evidence competent, and if believed sufficient whereon to ground an award of damages, if supplemented (as it was) by proof of sales and manufacture.

This expert's royalty rate the master "accepted, for the purpose of apportioning defendant's profits," choosing, however "15 per cent. rather than the minimum 10 per cent. or any figure between the two."

The sentence regarding "apportioning defendant's profits" is the master's method of stating the thought (naturally arising on this record) that a reasonable royalty under the Munger patent, a commercially unsuccessful invention, should be less than the price justly chargeable for using the detachable wedge of defendant's actual system. It is but another way of stating the thought of plaintiff's expert, when he suggested a percentage royalty, for his highest figure amounts to much less than the royalty defendant has been charging other manufacturers.

The case comes down to this: Having regard to the history of this invention, and the obviously more desirable application of the wedge principle used by defendant, was the master justified in using the higher rate suggested by plaintiff's expert rather than the lower? The matter is one not made plainer by discussion. After consideration of the record we are of opinion that the master should have taken the 10 per cent. estimate rather than the 15 per cent. one. It is therefore ordered that the decree appealed from be modified by reducing the amount of plaintiff's recovery to $48,713.39, and that, as so modified, the decree appealed from be affirmed, without costs in this court.