### K. W. IGNITION CO. et al. v. TEMCO ELECTRIC MOTOR CO.

### TEMCO ELECTRIC MOTOR CO. v. K. W. IGNITION CO. et al.

(Circuit Court of Appeals, Sixth Circuit. October 13, 1922.)

Nos. 3677, 3649.

1. **Patents** ⬤≫319(1)—**Reasonable royalty as measure of recovery for infringement.**

Where there is no satisfactory evidence by which to apportion profits made by defendant between infringing and noninfringing parts of the device sold or to establish complainant's damages from the competition, the most equitable measure of recovery is a reasonable royalty.

2. **Patents** ⬤≫319(1)—**Court may determine reasonable royalty, though no licenses were granted by complainant.**

The fact that complainant in an infringement suit has granted no licenses and fixed no royalty does not preclude resort to the reasonable royalty basis.

3. **Patents** ⬤≫312(3)—**Court may find reasonable royalty in absence of express testimony.**

Lack of express testimony as to the amount of a reasonable royalty does not preclude the court from considering that subject.

4. **Patents** ⬤≫189—**Infringer liable for sales in foreign countries.**

A defendant is liable for complete infringing devices sold in foreign countries, where made in the United States.

5. **Patents** ⬤≫319(4)—**Interest recoverable from date infringement ceased.**

Interest is recoverable on the amount of a royalty award for infringement from the date infringement ceased.

6. **Patents** ⬤≫319(3)—**Increased damages awarded for willful infringement.**

Increased damages awarded for willful infringement under Comp. St. §§ 9464, 9467, to draw interest from date of master's report.

Appeal and Cross-Appeal from the District Court of the United States for the Northern District of Ohio; John M. Killits, Judge.

Suit in equity by the Temco Electric Motor Company against the K. W. Ignition Company and Joseph A. Williams. Decree for complainant, and defendants appeal, and complainant brings cross-appeal. Reversed, and remanded for modification.

H. A. Toulmin and H. A. Toulmin, Jr., both of Dayton, Ohio, for Temco Electric Motor Co.

Walter F. Murray, of Cincinnati, Ohio, Moseley Arthur Keller, of New York City, and William L. Day, of Cleveland, Ohio (Clyde M. White, of Cleveland, Ohio, on the brief), for K. W. Ignition Co.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. These appeals are from the decree of the District Court upon the accounting for profits and damages for infringement of the Thompson patent, No. 1,072,791, relating to shock absorbers for automobiles. The decree of the District Court, which found the patent valid and infringed, was affirmed by this court. 243 Fed. 588, 156 C. C. A. 286. On the accounting the master found that the profits resulting to defendant from its infringement amounted to $164,431.54; that plaintiff presumably would have sold defendants' customers in the main if defendants had not, and that plaintiff's damages resulting therefrom were thus fairly measurable by the profits which defendants derived; that plaintiff was entitled to $29,026.91 interest on this recovery from the date the infringement ceased to the date of the master's report, as additional damages for delay in making reparation. The recovery so awarded amounted to $193,485.35. The master further recommended an award of punitive damages by reason of the "willful and malicious conduct of the defendants." The court increased the master's award by adding $50,000 for punitive damages, and (upon plaintiff's exceptions) by increasing the amount awarded on account of foreign sales by $40,589.93 (thereby charging defendants with the full receipts thereon as profits, "because the expenses connected therewith, including the cost of production of the goods so sold, had already been accounted to the defendant"), and by rejecting the master's allowance to the defendants of $24,787.58 for loss on account of scrap material left on hand at the close of the infringing period (Crosby Valve Co. v. Safety Valve Co., 141 U. S. 457, 12 Sup. Ct. 49, 35 L. Ed. 809), thus making the total award $308,862.-86, with interest from the date of the master's report. Both parties appeal—the defendants (No. 3677), so far as urged here, on account of alleged insufficient allowances for manufacturing and selling expenses, the allowance of punitive damages, and the award of the entire profits from the sale of the infringing structure, instead of apportioning the same between the device of the patent and certain features of the infringing device which defendants contend are not covered by plaintiff's patent[1]; the plaintiff (No. 3649) contending that the damages should have been trebled, or at least the award for punitive damages substantially increased.

For about a year previous to the infringing period the defendant company was the exclusive sales agent of the plaintiff, which itself manufactured the shock absorbers and sold them to defendant company, which agreed, by written contract, not to manufacture or endeavor to manufacture plaintiff's shock absorbers, and to respect its patent rights then existing or thereafter acquired.[2] The contract was highly profitable to both parties, the defendant company making a

---

[1] Error is assigned upon the allowance of the two exceptions taken by plaintiff to the master's report. These items, however, are not argued in defendant's brief.

[2] Plaintiff's patent was applied for before the contract was made. It issued before the infringement began.

sales profit of about $50,000 for the one year's business. Plaintiff being unwilling to reduce the contract price of the absorbers to defendant company to the extent asked by it, the contract was canceled, defendants at once beginning the manufacture and sale of the absorbers in open and aggressive competition with plaintiff. Defendant Williams was the president, manager, and principal stockholder of the defendant company. As said by then District Judge Clarke, who presided at the original hearing:

"The defendant Williams frankly confesses to a determination to divide the market with plaintiff even before the contract * * * was terminated, and he followed up his purpose with energy and enterprise."

The defendants' product, which had the same general shape and size and bore the same general black enameling and gold label as the plaintiff's, was offered to the same trade to which and under the same trade-name (K–W road smoother) by which defendants had marketed the plaintiff's product under the contract, and by which name the plaintiff's device had become known. The printed instructions for attaching defendant's shock absorbers to a car were in the main a verbatim copy of those that had accompanied the plaintiff's device when put on the market by defendants.

The device of plaintiff's patent is specially adapted for attachment to Ford automobiles. Its availability is such that the owner of a Ford car, without the services of a mechanic and without disturbing the operation or construction of the car, may, with slight instruction, remove the usual hanger which supports each end of each leaf spring and insert in its stead plaintiff's attachment. The absorber consists of an upright metal guide, whose lower end is rigidly attached to the car axle, and provides a platform for the lower end of a coiled spring, inclosed in a cylindrical metal casing or hanger, which bears against and is supported by the upper end of the coiled spring, and is so capable of upward and downward sliding movement on the guide. A link passing through an eye in the hanger connects with the free outer end of the leaf spring of the car. Since a coiled spring acts more quickly than a leaf spring, and since the former is interposed between the axle and the leaf spring, the recoil of the torsion spring begins before the full effect of the shock to the wheels can be transmitted through the leaf spring to the body of the car, thus making riding more easy. In the defendants' device the upright guide is divided, the lower end of its upper portion being connected by a link with the leaf spring, its upper end carrying a cup-shaped enlargement fitting over the top of the coiled spring, a leather packing on the top of which enlargement engages the inner wall of the cylindrical casing, forming what defendants call a "dash pot," the lower end of its lower portion being bolted to the axle. The hanger which acts on the coiled spring is thus inside instead of outside the coiled spring, but produces the same action thereon as does the casing or hanger of plaintiff's spring. Apart, at least, from the so-called "dash pot" and the radius link later referred to, there is thus a mere reversal of parts. The hangers in the two absorbers differ in form, but not in function. As said in our former opinion:

"The springs in a Ford automobile equipped with defendants' device receive shocks in the same order, operate in the same manner, and produce the same results as those in a Ford car on which plaintiff's springs are used."

The inspiration for the radius link admittedly came to defendants from plaintiff, which, before the contract between the parties was canceled, designed an absorber with the same reversal of parts as later employed in defendants' manufacture, which new structure it submitted to defendants. Defendant Williams tried on his machine a set of radius link absorbers made by plaintiff and found them apparently satisfactory. Defendants then knew what the proposed construction of plaintiff's so-called new radius link shock absorbers was to be, and that this new device was contemplated as the type to be manufactured under the contract, if the same were continued. It formed the substantial basis of defendants' manufacture after the contract was canceled, aside from the dash pot, and (with like exception) was plaintiff's type of manufacture during the infringing period. It turned out that after the issue of the Thompson patent, and at about the time the contract was canceled (and apparently without knowledge of either plaintiff or defendants), one Storrie had applied for a patent on a device embodying the radius link; that defendant Williams acquired an exclusive license thereunder eight or nine months after the cancellation of the contract between plaintiff and defendant; and that on interference priority was later awarded to Storrie on that feature as against Thompson, who had meanwhile made application for patent on that feature. This question of priority is not before us. Defendant Williams claims to have devised the dash pot.

A careful consideration of the record and of the briefs and arguments of counsel has failed to convince us that the master adopted an improper method of ascertaining defendants' total net profits from the manufacture and sale of the infringing device, or that his ultimate conclusion of the amount of such total profits was prejudicial to defendants, unless to a comparatively slight extent in respect to the precise ratio of defendants' general and selling expense (upon all its manufactured products), which are prorated by the master to the manufacture and sale of the infringing device.[3]

[1] If the case is to be disposed of upon the basis of profits made by defendants, the important and largely controlling question is whether, upon the record here, plaintiff was properly awarded the entire net profits made by defendant from the manufacture and sale of the infringing device (which contained the radius link and dash pot), or

---

[3] The infringing shock absorber was but one of 95 articles manufactured by defendant company during the infringing period; its total sales of all manufactured products being $9,173,411.44. The net amount received for sales of the infringing shock absorbers sold in the United States was $506,329.81. The foreign sales seem to have realized $58,563.96. The master applied to the general and selling expenses of the infringing period a ratio of a trifle more than 5½ per cent. of the total receipts from all defendant's manufactures. If the absorbers included in the item of foreign sales are taken into account as manufactured and sold during the above period, the ratio would seem to be about 6.15 per cent.

whether, as defendants contend, the recovery of profits as such should be based upon an apportionment thereof under affirmative findings of the respective contributions thereto by the invention of plaintiff's patent, on the one hand, and defendants' dash pot and radius link features, on the other. No apportionment was attempted by the master or by either of the parties. The solution of the question, as the record is here presented, thus depends upon which of the parties carries the burden of proving apportionment under the rules laid down in Westinghouse Electric & Mfg. Co. v. Wagner, 225 U. S. 604, 32 Sup. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653, paragraph "c" of which (225 U. S. 614, 32 Sup. Ct. 694, 56 L. Ed. 1222, 41 L. R. A. [N. S.] 653) puts the burden of proof on defendant "where profits are made by the use of an article patented as an entirety," while paragraph "d" (225 U. S. 614, 615, 32 Sup. Ct. 694, 56 L. Ed. 1222, 41 L. R. A. [N. S.] 653) puts the burden on the plaintiff when "plaintiff's patent is only a part of the machine and creates only a part of the profits," unless perhaps where the defendant has rendered apportionment by plaintiff impossible through commingling of elements and confusion of accounts. It follows that, if the case is to be disposed of on the basis of profits made by defendant, a conclusion that plaintiff carries the burden of apportionment would require a reversal for lack of sufficient data for the award. If defendant carries this burden, it must either pay all of the profits from the sale of its infringing device, or reversal must be had to give opportunity for proofs. The award or denial of substantial profits based entirely upon the question of burden of proof is usually unsatisfactory, as recognized and illustrated in numerous cases, including Dowagiac Co. v. Minnesota Co., 235 U. S. 641, 35 Sup. Ct. 221, 59 L. Ed. 398; U. S. Frumentum Co. v. Lauhoff (C. C. A. 6) 216 Fed. 610, 132 C. C. A. 614; Clark v. Schieble Co. (C. C. A. 6) 248 Fed. 276, 160 C. C. A. 354. Moreover, the record makes it highly probable that any express testimony on the subject of apportionment would, at the last, be largely guesswork; and it seems a debatable question whether the record shows such a commingling of elements and confusion of gains by defendants as would, standing alone, throw the burden of proof on defendants. While there is no testimony in terms that defendants' dash pot and radius link actually contributed to defendants' profits from the sale of the infringing device, there is testimony by defendant Williams that both were valuable improvements; and it cannot, we think, be confidently asserted that plaintiff's adoption of the radius link is no evidence of its utility, to say nothing of the effect of the allowance of the Storrie patent under the circumstances before stated. There is in this case no room for satisfactory comparison of profit-earning capacity of defendants' device with that of plaintiff during the infringing period, for the reason that during that period plaintiff's commercial device contained the radius link (covered by the Storrie patent), but not the dash pot. In view of all these considerations, and without determining the question of burden of proof of apportionment, we think it in the interest of justice, if not to the interest of all concerned, that the case be disposed of on

the present record, if practicable, as we think it is. The propriety of such disposition is, we think, established by the cases last above cited.[4] Defendants assert the propriety of such method of determining damages. Plaintiff perhaps would receive some compensation therefrom in the removal of the question of the correctness of the conclusion below that the amount of defendants' profits should be treated as damages accruing to plaintiff on the ground that plaintiff, but for defendants' infringing competition, could have sold the additional number of absorbers which defendant sold,[5] as well as in the removal of the question whether interest from the time infringement ceased (instead of from the date of the master's report) could be awarded on a finding of profits alone, and the further question whether the statute trebling or increasing damages is applicable to an award of profits only, and perhaps other questions as well.

[2, 3] The fact that plaintiff has granted no licenses and fixed no royalty does not preclude resort to the reasonable royalty basis. Dowagiac Co. v. Minnesota Co., supra; Malleable Iron Range Co. v. Lee (C. C. A. 7) 263 Fed. 896, 898. In our opinion the lack of express testimony as to the amount of reasonable royalty does not preclude us from considering that subject. Malleable Iron Range Co. v. Lee (C. C. A.) 263 Fed. 901, supra; and see Clark v. Schieble Co., 248 Fed. 283, 160 C. C. A. 354, supra.

During the contract year plaintiff sold defendant between 13,000 and 14,000 sets of absorbers, at prices ranging from $10 at the first to $8.20 per set later in the year. They were sold by defendant at $25 per set gross, which (as the highest discount was 50 per cent.) amounted to a net price of more than $12.50 per set. Both parties seem to recognize that plaintiff's manufacturing profits during this period (defendant did not then manufacture) amounted to about $60,000, or between $4 to $5 per set; that during this same year defendants' sell-

---

[4] In United States Frumentum Co. v. Lauhoff, supra, nominal damages only had been awarded the plaintiff below, on finding that defendant had made no profits, and that the proof was insufficient to support a conclusion that, except for the infringement, plaintiff would have made the sales. Reversal was had to enable the presentation of proof of general damages with elaborate discussion in that connection of the rule of reasonable royalty. In Clark v. Schieble Co., supra, damages had been awarded instead of profits. There was testimony tending to show that the selling value of the infringing device was fairly attributable one-half to the patent and one-half to the unpatented features. This court was, however, of the opinion that "the difficulties entering into the present case may be solved best by ascertaining the value of the patent property taken, or of the earning capacity of that property," which we thought not improperly called a royalty, and disposition of the question of damages was accordingly so made by this court on that basis.

[5] While we think the record would support this latter conclusion of fact, it is not convincing that plaintiff thereby would have made the profits which defendants made therefrom. The latter's manufacturing and selling expenses per se might well, and perhaps presumably would, be less than plaintiff's—as to the first, because of the division of defendant's overhead among so many articles of manufacture; and, as to the second, because of defendant's strong selling organization and the fact that it had alone occupied the field for a year before infringement began. See Frumentum Co. v. Lauhoff, 216 Fed. 614, 132 C. C. A. 614, supra; Dowagiac Co. v. Minnesota Co., 235 U. S. 648, 35 Sup. Ct. 221, 59 L. Ed. 398, supra.

ing profit was about $50,000, or between $3 and $4 per set, making the combined manufacturing and selling profit nearly $8 per set. On the main hearing this court found, as did the court below, that plaintiff's device practically sold itself, and that the problem was not so much to find customers as to manufacture the device rapidly enough to meet the demand. In the negotiations for a continuance of the contract plaintiff was willing to sell at a price starting with $7.50 per set and running as low as $6.60 per set—above a certain number ordered. On its domestic and foreign sales combined, defendant seems to have received about $8.48 per set net. On the basis of the master's report, defendant company's combined manufacturing and selling expense seems to have amounted to about $5.06, after correction by the allowance on account of scrap at the end of the infringing period, as made by the court. In view of these facts the master's award on the basis of profits seems to have amounted to about $3.45 net profit per set.

We are disposed to think the record justifies the conclusion that until infringement wase begun defendants would have regarded a royalty of $2 per set, covering both manufacturing and selling, as not excessive. Defendant Williams testified that until December, 1913, defendant could have sold 10 times what the plaintiff was then producing. The same defendant, in the negotiations for a lesser price for a further period, offered to assure plaintiff $100,000 profit on the next year's sales if permitted to make his own price. Defendants asserted that it would cost defendant company not more than $5 per set to manufacture. That defendants would have regarded $2 per set reasonable royalty at the time the infringement began lacks little, if anything, of being practically conceded by the closing entry of December 31, 1917 (four months after the accounting proceedings were begun), on a looseleaf constituting page 170 of the private journal of defendant company: "Reserved for road smoother liability, 56,923½ sets at $2 each, $113,947." [6] The fact that the number of Ford cars is practically one-half of all cars in use indicates an immense potential market for the device, justifying a comparatively small margin of profit. The fact that bitter competition, especially between plaintiff and defendants, has changed the situation, does not make against the conclusion we reach that $2 per set was a reasonable royalty, or, otherwise stated, a fair measure of damage for defendants' use of plaintiff's invention. While this $2 royalty (about 23⅓ per cent. of the selling price) is somewhat larger than has been awarded in cases generally, we think the exceptional nature of this case fully justifies it.

[4] A majority of this court is of opinion that this royalty should be awarded not only upon the 59,248 sets of absorbers sold by the defendant in the United States, but also upon the 7,378½ sets sold for use abroad. If the completed shock absorbers so sold embodied plaintiff's entire invention under the patent, defendants would be equally liable whether the absorbers were sold abroad or here, they having been manufactured in the United States. Dowagiac Co. v. Minnesota

---

[6] We think the master and the district judge clearly justified in refusing to accept the explanation attempted to be made by defendant's accountant of the meaning of this entry, as different from what it appears on its face.

Co., 235 U. S. 650, 35 Sup. Ct. 221, 59 L. Ed. 398, and cases cited; Bullock Co. v. Westinghouse Co. (C. C. A. 6) 129 Fed. 105, 109, 63 C. C. A. 607.

The objection to the inclusion of foreign sales is based on the proposition that the absorbers, as manufactured and as sold, embodied less than all of the elements of the patented combination. The Bullock Case, just cited, is an authority for defendants' general proposition. It is true that each claim of plaintiff's patent states a combination "in automobile construction" or "in an automobile," and that in each claim the leaf spring of the automobile and its axle are included. But it is only in a highly technical sense that the patent can be regarded as upon an automobile. Although stated to be for an improvement in automobiles, it is wholly confined to the shock absorber device. The automobile is just as much an automobile without the absorber as with it, and was constructed and sold in the same way, whether or not shock absorbers like plaintiff's were to be applied. The Storrie patent, on which defendants rely for their radius link, is classified as relating to shock absorbers. The absorbers in question were separate articles of manufacture, and so distinguished from the Anger device, which defendants urge as an anticipation of plaintiff's patent, and which, as stated in our former opinion, was "primarily built into the car, and is not constructed as a separate or separable part." Its entire spring arrangement must be built and put in place at the factory, and the axle specially made, in order to admit the use of the Anger mechanism.

[5] Interest should be included on the amount of the royalty award from the date infringement ceased, and until the entry of the final decree of the court below in accordance with this opinion, and not merely from the date of the master's report. Oehring v. Fox Co. (C. C. A. 2) 251 Fed. 584, 588, 163 C. C. A. 578; Clark v. Schieble Co., 248 Fed. 283, 160 C. C. A. 354, supra; Goodrich v. Consolidated Co. (C. C. A. 7) 251 Fed. 617, 624, 163 C. C. A. 611; Malleable Iron Range Co. y. Lee, 263 Fed. 902, supra.

A conclusion of willful infringement, which would be supported by the considerations elsewhere stated in this opinion, is not necessarily overcome by the considerations that the district court found invention with misgiving, that this court found the invention narrow, and that defendant Williams, as he testified, was advised by patent attorneys that plaintiff's patent could not be sustained, and that defendant's device as marketed was not an infringement. Upon this record the court was not bound to credit the claim of good faith. Invention in patented combinations is frequently narrow, and is frequently found with misgivings; but one who, as Judge Clarke expressed it, "started out not to patent an invention, but to invent a patent," at best took his chances upon favorable decision of the questions of invention and infringement, with knowledge that he was potentially subject to account for profits and damages, and is in no position, when these questions are found against him, to insist that he has made a demonstration of good-faith infringement which is merely the antithesis of willful infringement. In saying this, we do not overlook the fact that the agreement of the corporate defendant to respect plaintiff's patent rights did not

estop it from contesting the validity of the patent after the contract was canceled. But that is not the whole case.

[6] We also think that substantial damages should be awarded to plaintiff under the statute for trebling or increasing damages.[7] It is to be noted that in the closing entry on the private journal of the defendant company for the year 1917 the reserve there mentioned is made to include also an item of "$50,000 for punitive damages and other contingencies." We think that this award, under the statute cited, should be large enough to include damages for unfair competition, which the master found could not be satisfactorily assessed separately, but which would include the presumably abnormal cost incurred by plaintiff in selling its product during a substantial portion at least of the first year of the infringement, plaintiff's expenses of a protracted litigation running over a period of several years, as well as by way of punishment. In our opinion $50,000 is not a sufficient award for these purposes. We think it should be increased to $100,000, to be added to the award otherwise made, and to draw interest from the date of the master's report.

The decree of the District Court is accordingly reversed, and the record remanded to that court, with directions to make a new decree in accordance with this opinion. The costs of this court will be divided.

---

[7] Compiled Statutes, §§ 9464 and 9467.