## MOTOR PLAYER CORPORATION v. PIANO MOTORS CORPORATION et al.

District Court, D. New Jersey. June 8, 1927.

1. Patents ⬯318(6)—Infringer, accounting for profits, may charge interest on investment as an expense.

In an accounting for profits by an infringing manufacturer, interest on its investment is allowable as an item of expense.

2. Patents ⬯312(1¾)—Where patent covers entire device, and complainant and infringer only compete, and infringer could furnish whole market, presumption is complainant would have sold machines sold by infringer, but for infringement.

Where a judicially sustained patent covers the device in its entirety, and the competitive struggle to create and supply the market is confined to complainant and defendant, an infringer, and complainant had ample means and facilities to supply the number sold by defendant in addition to its own sales, generally a presumption is warranted that, except for the infringement, it would have produced and sold the machines sold by defendant.

3. Patents ⬯312(3)—To warrant recovery of damages from infringer on ground of loss of sales, there must be proof with reasonable certainty.

Recovery of damages from an infringer on the ground of loss of sales is not warranted, unless there is evidence which establishes with reasonable certainty that a certain number of sales made by defendant would, but for its competition, have been made by complainant.

4. Patents ⬯319(1)—Actual damages sustained through infringement may be recovered, though invention has not been commercial success.

Lack of commercial success of a patented invention does not in itself disentitle the patentee from recovering substantial damages for injuries actually sustained through infringement, since the lack of profit may have been due, in whole or in part, to the infringement.

5. Patents ⬯319(1)—Where ordinary measures of damages for infringement are not available, general damages by way of reasonable royalty may be given.

Where there has been substantial injury from infringement, but the usual measures of damages by showing loss of sales or express royalty are not available, general damages by way of reasonable royalty should be given, if the evidence furnishes a reasonable basis for application of the rule.

6. Patents ⬯319(1)—Reasonable royalty, measuring damages, may be based on manufacturing cost.

Where by reason of competition by infringer from the beginning, a normal selling price was never established, reasonable royalty may be based on manufacturing cost.

7. Patents ⬯319(1)—Complainant held entitled to damages for infringement on reason-

able royalty basis plus increase under treble liability statute (Comp. St. § 9467).

Damages for willful infringement of Garman patent, No. 1,320,224, for motor-driven suction-producing apparatus for a player piano, based on a reasonable royalty fixed, and increased by $15,000 under Rev. St. § 4921 (Comp. St. § 9467).

In Equity. Suit by the Motor Player Corporation against the Piano Motors Corporation and George W. Garman. On exceptions to master's report on accounting. Modified, and final decree for complainant.

Bates, Macklin, Golrick & Teare, of Cleveland, Ohio (Justin W. Macklin, of Cleveland, Ohio, of counsel), for plaintiff.

Kenyon & Kenyon, of New York City (Theodore S. Kenyon, of New York City, of counsel), for defendant Piano Motors Corporation.

RELLSTAB, District Judge. The defendants were held to have infringed letters patent No. 1,320,224, covering a motor-driven suction-producing apparatus for a player piano, acquired by the plaintiff through mesne assignments from Garman, the patentee and codefendant. 282 F. 435. While the interlocutory decree included both defendants, the accounting was prosecuted against only the defendant corporation. All further references herein to defendant indicate the corporation only.

This patented device, called Electora, and that of the defendant, named Motora, are complete devices, serving the same mechanical purpose. The master reported that, "during the period covered by this accounting, defendant sold a net number of 2,035 Motoras"; that, by reason of the infringement, it had made a profit of $485.71; that he was "not satisfied that plaintiff could have made the sales which defendant made"; that in his opinion the plaintiff was "not entitled to recover of defendant any sum of money for damages by way of lost sales"; that the profit so found was "not an adequate measure of the damages suffered by the plaintiff through the wrongful act of the defendant"; that in his opinion the plaintiff was entitled to recover damages from the defendant, as a reasonable royalty, the sum of $3.77 on each of the infringing Motoras manufactured and sold by it, amounting in the aggregate to the sum of $7,671.95; that, as the District Court and the Circuit Court of Appeals (282 F. 435) had found that the defendant had been "guilty of a wanton and willful invasion of the rights of the plaintiff," the plaintiff was entitled to treble damages, which he fixed at $23,015.85.

This report is excepted to by both parties. In substance, the exceptions of the plaintiff-challenge the master's failure to find damages on account of lost sales and his basis in fixing the percentage for reasonable royalty; those of the defendant challenge the finding of profits and reasonable royalty as damages.

[1] *As to profits:* The master first found that no profits had been made by the defendant, but on reconsideration allowed $485.71. In reaching this latter conclusion, he disallowed a number of claimed items of expense in running the business, among them $2,949.17, interest on investment. The rejection of this item was clearly error. Computing Scale Co. v. Toledo Computing Scale Co. (C. C. A. 7) 279 F. 649, 678; Standard Scale & Supply Co. v. Cropp Concrete Machinery Co. (C. C. A. 7) 6 F.(2d) 447, 451; Producers' & Refiners' Corp. v. Sears & John S. Lehmann et al. (C. C. A. 8) 18 F.(2d) 492. Had the master allowed this item, it alone would have changed defendant's supposed profit into a definite loss.

On the argument the plaintiff conceded that the defendant made no profit, and that it was depending upon damages. This exception of the defendant is sustained.

[2] *As to the failure to award damages on account of lost sales:* Where, as in the instant case, the judicially sustained patent covers the device in its entirety, and the competitive struggle to create and supply the market for such devices is confined to the plaintiff and the defendant, and the plaintiff has ample means and facilities to supply the number sold by the defendant, in addition to its own sales, generally a presumption is warranted that except for the infringement, the plaintiff would have produced and sold the machines sold by the defendant. In Regina Music Box Co. v. F. G. Otto & Sons (C. C.) 114 F. 505, it was so held, and in Continuous Glass Press Co. v. Schmertz Wire Glass Co. (C. C. A. 3) 219 F. 199, 206, this presumption was stated as undoubted.

The testimony of the plaintiff's salesman that he could have sold more of the plaintiff's machines, except for the defendant's competition, and that the litigation between the parties interfered with the sales, is easily believable, and supports the presumption. However, there is evidence by an officer and director of the defendant's largest customer, whose company bought about one-half of the infringing Motoras, that if it had not been able to purchase the Motoras it would not have used the plaintiff's Electoras during the infringing period. The reason assigned was

that the samples of the plaintiff's Electora, submitted at that time, were not entirely satisfactory and did not meet the requirements. This evidence was not overcome, and cannot be brushed aside as of no significance. While it may be that plaintiff's unsatisfactory samples were of the experimental stage of manufacture, yet its effect is to so weaken the presumption referred to, when sought to be applied to the facts of the instant case, as to make it practically valueless.

[3] We may readily conclude that the plaintiff lost sales through the defendant's infringement. But this alone is not sufficient reason for awarding specific damages. The pertinent question is, How many? And the answer is not to be arrived at by guessing, as, for instance, that the plaintiff would have sold all the machines marketed by the defendant, other than those to its largest customer referred to. A certain number must be proved, not necessarily with absolute accuracy, but with such data as will reasonably indicate a given number of sales that the defendant's wrongdoing actually took from the plaintiff. See Walker on Patents (5th Ed.) p. 622; Rude v. Westcott, 130 U. S. 152, 9 S. Ct. 463, 32 L. Ed. 888; McSherry Mfg. Co. v. Dowagiac Mfg. Co. (C. C. A. 6) 160 F. 948; United States Frumentum Co. v. Lauhoff (C. C. A. 6) 216 F. 610; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U. S. 641, 35 S. Ct. 221, 59 L. Ed. 398; American Telephone & Telegraph Co. v. Radio Audion Co. (D. C.) 5 F.(2d) 535. This reasonable certainty is not afforded by the evidence in the instant case.

The plaintiff's exception to the master's finding against damages because of lost sales is overruled.

[4] *As to reasonable royalty:* The plaintiff never established a royalty for the use of its device. In line with the defendant's contention that only nominal damages are permissible, it is insisted that plaintiff's invention had no commercial value; that, while mechanically it might be an improvement over the prior art, yet "commercially, financially," it was a failure. Admittedly both parties lost money during the entire infringing period, but lack of commercial success in itself does not disentitle the patentee from recovering substantial damages for injuries actually sustained through infringement. Munger v. Perlman Rim Corp. (C. C. A. 2) 275 F. 21. In the early and experimental stages of the manufacture of new articles of commerce, it is not unusual to incur expenses of a character that are later avoided; also in the struggle for the market, forced upon the owner of a patented device by infringing

competitors, some expenses are sustained, which would not have been, except for the unlawful competition.

In the instant case the defendant's determined disregard of the plaintiff's patented rights, and its persistent and successful endeavor to share the market with the plaintiff, were bound to upset the trade, increase the overheads, reduce the selling price, and make it more difficult and expensive for both parties to sell their respective products. The plaintiff's failure to secure the sales to which it was legally entitled, the diminished price of the machines actually marketed by it, and its litigation expenses, all chargeable to the defendant's wrongdoing, plus the usual increased costs of manufacture in the experimental and developing stages of this new product, readily account for the plaintiff's failure to make a profit during the infringing period. In such circumstances, the lack of profit at the end of the infringing period has little, if any, significance on the question of the commercial value of the patented device. More significant is the fact that, after the infringement had ceased, the plaintiff's sales increased about 100 per cent. That fact alone, in my judgment, negatives defendant's contention that plaintiff's device lacked commercial value.

[5] In such a situation nominal damages will not satisfy the tortious taking of the plaintiff's property. Before the acceptance of what has come to be known as the reasonable royalty rule as a measure of damages, nominal damages only were allowed in *many* cases, even where it was reasonably certain that substantial damages had been sustained. Happily, however, the employment of this additional measure of damages has ended this species of legal injustice, and merely nominal damages are now awarded only where the evidence fails to show that the injured party has sustained substantial damages.

Where, as in this case, the plaintiff's exclusive right has been infringed to its substantial injury, substantial damages should be awarded; and in case the primary measures of damages, viz. lost sales or express royalty, are not available, general damages by way of reasonable royalty should be given, if the evidence furnishes a reasonable basis for the application of that rule. McCune v. Baltimore & Ohio R. Co. (C. C. A. 3) 154 F. 63; United States Frumentum Co. v. Lauhoff (C. C. A. 6) supra, 216 F. 610; Dowagiac Mfg. Co. v. Minnesota Mohne Plow Co., supra, 235 U. S. 641, 35 S. Ct. 221, 59 L. Ed. 398; K. W. Ignition Co. v.

Temco Electric Motor Co. (C. C. A. 6) 283 F. 873; American Telephone & Telegraph Co. v. Radio Audion Co. (D. C.) supra, 5 F.(2d) 535.

[6] On the subject of reasonable royalty the master said: "In my opinion plaintiff is entitled to recover of defendant damages by way of reasonable royalty to be allowed to plaintiff on each of the 2,035 infringing Motoras manufactured and sold by defendant; that for the purpose of establishing a proper sum to be charged as such reasonable royalty I have accepted the prime cost of manufacturing each Motora as shown on defendant's account (Exhibit 2D, page 1), to wit, the sum of $37.42; that I have computed the amount of factory overhead chargeable to each Motora on the total of $8,225.32 as allowed for the factory overhead for the purposes of this accounting, and by such computation I have found $4.04 chargeable as factory overhead to each Motora, and, adding said last-mentioned sum of $4.04 to the said sum of $37.42, I have found the gross cost of manufacturing each Motora to be $41.46, and that, after deducting the sum of $3.77 on each Motora for inventory adjustments, which I have allowed, I find the net manufacturing cost of each Motora to be $37.69; that from the testimony I have concluded that 10 per cent. of such net cost of manufacturing each Motora would be a fair amount to award to plaintiff as reasonable royalty to be paid by defendant, and, accordingly I have computed the reasonable royalty to be paid by defendant on each Motora manufactured and sold by it at the sum of $3.77, and that the amount of such reasonable royalty on the 2035 Motoras manufactured and sold by said defendant is the sum of $7,671.95."

The plaintiff excepts to the basis adopted by the master and contends that the average sales price, and not the cost of manufacture of the infringing Motoras, should have been adopted. The purpose of applying the reasonable royalty rule is the same as where the primary measure of damages are available, viz. to make the plaintiff whole for the damages flowing proximately from the defendant's wrongdoing. This royalty may be determined on a percentage applied to the selling price, net cost, or net profit, or by a flat rate. Where the parties are free to negotiate as to what would be a proper or reasonable royalty, and an amount is agreed upon, it will usually be determined by what a person thinks he can afford to pay for a, share in the monopoly and still make a, reasonable profit.

In the present case, what sales price the

market would have permitted, had the defendant respected the plaintiff's monopoly, cannot be ascertained, for the reason that the defendant began making and selling its infringing device about the same time the plaintiff began to make and sell its device, and before it had established a market for its invention; and as this infringement persisted until it was judicially determined that it should be enjoined there was no time during the infringement that the market could reflect the fair selling price for this device. In the absence of evidence of a normal selling price, the master's selection of the defendant's cost of manufacture —the correctness of which is not questioned, and which corresponds to the estimated cost of the manufacture of plaintiff's Electoras— as a base to determine reasonable royalty, was justified. However, it is not a question of the base adopted, but whether the evidence sustains the royalty fixed as reasonable, regardless of the base or method used in determining it.

[7] On the question whether the master's finding of $3.77 per infringing Motora is reasonable, we have striking evidence of what the defendant thought the market would bear as a royalty, and still give it a profit in the manufacture and sale of the infringing device. In its account, furnished pursuant to the equity rules and the master's order, under the head of expenses, it claimed a credit of a $3 royalty for each Motora sold. This royalty, according to the testimony of Joseph J. Leinmiller, secretary and treasurer of defendant, and William W. Paul, defendant's employee, who prepared the account, was to cover the manufacturing rights for improvements made on the infringing device outside of the Garman patent. The defendant's witness Paul said that sum was fixed at a conference with the officials of the defendant, and that it was agreed by them that that amount was the fair value of such improvements. This proposed $3 royalty, which the defendant thus suggests as reasonable for a part only of the infringing device, though never paid, is, to say the least, very persuasive that the royalty found by the master covering the entire device is not too high.

The evidence shows that, before the plaintiff became the owner of the patent in suit, a contract was made on its behalf with Charles W. Young, who was then the owner of the patent, for the use of that and another patent in the construction of Electoras, whereby he was to receive 8 per cent. on the selling price of that device. This contract was in existence but a short time, and was turned over to the plaintiff with other things at the time it became the owner of these two patents. This royalty was agreed upon before there was an established market value of the patented article, and reflects only what the plaintiff expected the market would permit and still secure it a profit in the manufacture and sale of this device. Whether this expectation would have been realized cannot be determined, for the reason, as already stated in dealing with another phase of this question of royalty, that because of the tortious interference by the defendant the plaintiff was not permitted to enjoy its exclusive rights under this patent, and never obtained a normal market for its device.

At the time the defendant launched upon this infringing enterprise, Stanley S. Cramer, its president, who, it is alleged, conceived and mainly perfected the so-called improvements on the Garman device, for which the $3 royalty referred to was to be charged, figured that the supposed improved machine —Motora—could be made for about $40 and sold for about $65, yielding a profit of from $20 to $25. Roland L. Stratford, the plaintiff's manager, fixed the sales price of each Electora actually sold at $60, and its cost at $37.75, with a resultant gross profit of $22.25. While it is true that the net result of the plaintiff's business during the infringing period was a loss, yet, as that undoubtedly was due to the abnormal trade conditions under which it labored, the greater part of which was directly chargeable to the defendant, Stratford's testimony in this particular, when considered with the defendant's estimate of expected sales price and profit, carries a persuasiveness that the profits anticipated by the defendant had a substantial basis, and probably would have accrued to the plaintiff, except for the defendant's wrongdoing.

The friendly relations that existed among Cramer and the other officers of the defendant, who collaborated with him in developing and perfecting the infringing Motora, suggest that the fixing of the $3 as a reasonable royalty for the supposed improvements over the Garman device heretofore referred to was more likely to be below than above their real worth to the company. At any rate, it was for but a part of the infringing Motora, and as the defendant's machine was an infringement of the plaintiff's device in its entirety, the difference of 77 cents between the royalty fixed by the master and that fixed by the defendant warrants the inference that the master's finding is too low.

How much too low? The master had a

difficult problem to solve. He had to determine it, though certain facts usually attendant in such investigations necessarily were absent. Abnormal trade conditions, the result of the defendant's wrongdoing, as noted, prevailed throughout the whole history of this particular commercial enterprise. It is certain that, if the matter of royalty had been left to the free negotiation of these parties, under normal trade conditions, the plaintiff would not have agreed to as low a sum as was fixed by the master. To force it now, after having successfully brought the infringer to book, would be to turn the defendant's wrongdoing to its commercial advantage, and the equivalent of a premium for its misconduct.

William N. Bauer, for many years a manufacturer and seller of pianos, who himself was an inventor and patentee, testified that he received $10 royalty from a licensee of one of his patents, covering a sound board and other improvements to pianos. This royalty, being for improvements in the same art to which the plaintiff's and defendant's devices belonged, suggests that the plaintiff would have been able to secure a royalty far in excess of that allowed by the master, if the defendant had permitted it to exercise the free hand in negotiating for royalties to which it was legally entitled.

According to the defendant's accountant, Paul, the average sales price of the defendant's Motora was $45.58, while the plaintiff's manager, Stratford, gave the average sales price of the plaintiff's Electora as $60. Ten per cent. applied to either figure would give a considerable increase in royalty over that found by the master. Such a percentage is not unusual in determining reasonable royalty. Of course, the fact that such a percentage is warranted in some cases does not justify its use in all cases. But what is there in the circumstances of this case that suggests that the employment of this percentage, even if applied to the larger named sales price, would do injustice to the defendant? This price ($60) is less than the defendant's estimated figure, which was arrived at when normal trade conditions were expected. It is deemed inferable, from the evidence in this case, that the sales price per Electora would have been not less than $65, except for the unlawful interference by the defendant.

In view of the $10 royalty agreed upon for the improvements made to pianos, as testified to by the witness Bauer, and the profits that probably would have accrued to the plaintiff, except for the defendant's unlawful competition, which probably would have been more, and certainly not less, than $22.25 per Electora, to allow less than $6 per infringing Motora would be to favor the wrongdoer, which, of course, would be abhorrent to justice. As between the wronged and the wrongdoer, if the sword of justice in making the cleavage must shed blood, it had better be drawn from the latter than the former. Justice forbids that the innocent should share with the guilty in the consequences of the injury. Keeping out of view the smart money damages that are allowed in certain cases, and confining myself to conservative estimates in determining damages in the nature of compensation for the direct injury inflicted, I am constrained to increase the amount of the master's finding of reasonable royalty, and I fix it at $6 per infringing Motora, and the total at $12,210.

*As to increased damages:* As noted, the master reported that the plaintiff was entitled to recover treble damages. His assigned reason for the increase is that the defendant was guilty of a wanton and willful invasion of the plaintiff's rights. From the record in the main case and that made before the master, it appears that in May, 1918, Garman and William A. Warren, under the partnership name of Rotora Manufacturing Company, in a small way began the manufacture of electrically driven suction appliances, called Rotoras; that they filed a joint application to obtain a patent for this device in July, 1918; that this manufacture was discontinued in October, 1918, because of the lack of working capital; that in November, 1918, Garman called upon Cramer and Leinmiller, then trading as the Federal Tool & Machine Company, and sought to interest them in the manufacture of such suction device; that in February, 1919, Garman and Warren met Young, who agreed to finance the manufacture of the device; that on March 21, 1919, Warren disappeared, and was not thereafter seen by Garman; that pursuant to two written agreements, bearing the last-mentioned date, Garman worked for Young in the promotion of the manufacture and sale of this device for about 20 weeks, until some time in August or September, 1919, when Young prevented him from doing any further work; that on March 29, 1919, several days before the Garman application for the patent in suit was filed, he assigned his interest therein to Young; that in the latter part of March, 1919, Garman introduced Young to Cramer at the office of the Federal Tool & Machine Company, and that on April 7th following,

a contract was entered into between that company and Young for the manufacture of 500 of these devices; that, after some work was done and some machines made under this contract, it was discovered that the specified motor was not of sufficient power, and by agreement the contract was ended on October 17, 1919; that Cramer, believing that there was a market for devices of that kind, and that the Young machine did not have the required efficiency, began the development of a motor of his own, which was completed in October, 1919; that on August 21, 1919, Cramer applied for a patent for this motor, and requested that his application be put in interference with the patent in suit, and a patent was granted him on October 10, 1922; that the defendant was incorporated by Cramer, Leinmiller, and Garman, October 10, 1919, to finance and manufacture the Cramer motor, Cramer being made the president and general manager, Leinmiller secretary and treasurer, and Garman vice president and a director; that each was given a one-third stock interest in the corporation, Garman's being for his salesmanship abilities, and they, as the defendant, began making and selling the infringing motor, and continued so to do until enjoined by the decree of this court; that the patent in suit, issued on the Garman application (owned by Young), was granted October 28, 1919.

From this recital the inference is justified that Cramer and Leinmiller knew the scope of the invention claimed in the Garman application for patent, assigned to Young; that they were familiar with, and participated in, the mechanical steps taken to make the Young device efficient and marketable, and they and Garman knew that the Young motor, as specified, would not develop sufficient power to meet the market's requirements; that, while they were working under contract with Young to manufacture his motor-driven suction apparatus, and while his application for a patent to cover it was pending, Cramer, with Leinmiller's and Garman's assistance, planned and developed the device which the defendant subsequently marketed, and which was declared by the Circuit Court of Appeals (282 F. 435, 439) to be "detail by detail, element by element, function by function," the same as the device covered by the patent in suit, and a clear infringement thereof.

These creators of, and sponsors for, such a device do not stand in the shoes of ordinary infringers. Their conduct suggests a deliberate purpose to appropriate the invention conveyed by one of them to the plaintiff's predecessor in title, and to secure for themselves the market for the device embodying it. Their wrongdoing seriously injured the plaintiff, not only by depriving it of the profits that would otherwise have accrued to it, but in saddling it with large and unnecessary litigation expenses. To limit the award to the amount here found to be a reasonable royalty would fall far short of making the plaintiff whole for the losses sustained by reason of the defendant's persistent infringement, work mainly to the benefit of the wrongdoer, and be an encouragement to like-minded infringers. To prevent that kind of injustice the statute (R. S. § 4921 [Comp. St. § 9467]) was passed. Acting under its authority, I am constrained to increase the amount here found as reasonable royalty, not by trebling it, as may be done under this statute, but by adding thereto $15,000, which is deemed sufficient to care for the litigation expenses incurred by the plaintiff and not covered by the taxed costs, and to cover the punitive damages which the facts in this case demand should be inflicted on the defendant.

A decree may be entered for $27,210, with interest on the sum of $12,210 from the date that infringement ceased, and on $15,000 from the date of the master's report, together with the costs of suit, to be taxed.