AMERICAN VALVE & METER CO. et al. v. FAIRBANKS, MORSE & CO. et al.

(Circuit Court of Appeals, Seventh Circuit.    August 10, 1917.    Rehearing Denied December 18, 1917.)

No. 2423.

1. PATENTS ⬡⟶328—VALIDITY AND INFRINGEMENT—RAILWAY WATER COLUMN.
    The Johnson patent, No. 818,968, for a railway water column, was not anticipated, and discloses invention of a meritorious character.    Claims 1, 21, and 38 also *held* infringed.

2. PATENTS ⬡⟶328—VALIDITY AND INFRINGEMENT—RAILWAY WATER COLUMN.
    The Foster patent, No. 798,406, for a railway water column, while for an improvement only on that of Johnson, first applied for, discloses patentable invention; also *held* infringed.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by the American Valve & Meter Company and Edward E. Johnson against Fairbanks, Morse & Co. and the Sheffield Car Company. Decree for defendants, and complainants appeal. Reversed.

Appellants failed in their suit to enjoin the alleged infringement of claims 1, 11, 21, and 38 of patent No. 818,968, issued April 24, 1906, to Johnson, and claim 1 of patent No. 798,406, issued August 29, 1905, to Foster, both for improvements in railway water columns.

Johnson's general statement of his invention to obviate defects in prior water columns, and the claims in suit, read as follows:

"This invention relates to improvements in railway water columns or devices of that class which are more particularly intended for supplying water to locomotive tenders and which comprise a stand pipe located alongside of a railway track, or between two such tracks, and a laterally extended spout on the standpipe to be turned either at right angles to the tracks to supply water to locomotive tenders or parallel to the track to avoid the passing trains when not in use, and also adapted to be swung vertically throughout a considerable range of movement for the purpose of bringing the mouth of the spout into immediate proximity to the tank openings of tenders of various heights and of avoiding the coal which is piled on the tenders above the water tank.

"The present improvements have relation particularly to the most desirable type of this class of apparatus—namely, the type in which the spout is pivoted to the standpipe at a point below the end thereof and telescopes at its inner end loosely over the downward turned end or nozzle portion of the standpipe.

"One of the defects of railway water columns of this kind, as heretofore constructed, has been that the end of the spout in moving downwardly swings to one side of a vertical line of descent to such an extent as to carry it laterally beyond the tank opening or water hole of the tender, either at the upper or lower, or at both, limits of its movement; and a principal object of the present invention is to avoid this difficulty by mounting the spout in such manner that the arc of movement described by the end of the spout, even when the range of movement provided is unusually great—six feet, or more—will so closely approach a direct vertical line as to keep the spout at all times in proximity to the tank opening, whatever the height of the tender.

"A further object of the invention is to provide water courses free from obstruction and abrupt changes of direction, and a spout draining quickly away from the standpipe, and not liable to be inoperative from freezing."

"1. A water column, comprising a standpipe terminating at its upper end in a nozzle, a spout swinging loosely over the nozzle and draining away from the standpipe, and a support for the spout pivoted to the standpipe, at a point

approximately opposite the middle point of the arc, the delivery end of the spout is usually required to describe in being adjusted to tanks of the average height and below the uppermost level of the outlet of the spout, substantially as described."

"11. A water column, comprising a standpipe, terminating at its upper end in a reversely curved gooseneck, as shown, a swinging spout fitting loosely over the nozzle of the gooseneck and a support for the spout pivoted to the standpipe, substantially as described."

"21. In a water column, of the character described, the combination with a standpipe having an extended discharge nozzle secured at the head thereof, a discharge pipe whose inner end telescopes with said discharge nozzle so as to be moved freely thereon, and which inclines downwardly away from said nozzle in all its positions, a connection uniting said discharge pipe with the standpipe of the water column and pivoted to said standpipe in a horizontal plane below the horizontal plane of the outlet of the discharge pipe when in its fully elevated position at a point approximately opposite the middle point of the arc the delivery end of the spout is usually required to describe in being adjusted to tanks of the average height, and means for counterbalancing the discharge pipe, whereby the range of movement of said outlet is in a substantially vertical plane."

"38. In a water column, of the character described, the combination with a standpipe of an extended discharge nozzle secured at the head thereof, a discharge pipe whose inner end telescopes with said discharge nozzle so as to be moved freely thereon, a connection uniting said discharge pipe with the standpipe of the water column and pivoted to said standpipe in a horizontal plane below the horizontal plane of the outlet of the discharge pipe when in its fully elevated position, and means for counterbalancing the discharge pipe, whereby the range of movement of said outlet is in a substantially vertical plane."

Figure 1 of Johnson is a general illustration of the features here involved:

FIG. 1.

Foster's patent was issued ahead of Johnson's, but Johnson's application was filed more than a year before Foster's. And proceedings in the Patent Office on the copending applications were such that Foster's patent must stand or fall as an improvement of Johnson's device only in the means by which the loose spout is carried and swung.

Foster's claim is this:

1. "In a water column of the character described, the combination of a revoluble standpipe, an extended discharge nozzle secured at the head thereof, a discharge pipe whose inner end is united loosely and telescopically with said discharge nozzle, so as to be moved freely thereon, a pivoted link connection uniting said discharge pipe near its inner end with the standpipe of the water column, and means for counterbalancing the discharge pipe, whereby said discharge pipe may be raised or lowered always in a vertical plane, no matter at what angle it may occupy to the track, substantially as described."

In Foster's drawing, inserted below, the links *b*, pivoted to each side of the column at *f* and also to each side of the spout at *a*, together with the chain *h* attached to the spout at *l* and the counterweight *F*, constitute the improved means for carrying and swinging the spout.

In support of the ruling that Johnson's patent is void for lack of invention the strongest reference to the prior art is patent No. 648,346, April 24, 1900, to Poage, for a water column, and a modification thereof in practice.

Poage's Figures 1 and 5 are here reproduced:

Of the coupling between column and spout Poage says:

"*C* is a downwardly inclined male coupling rigidly fastened to the pipe *B* and having a bore *c* of the same diameter as said outlet *b* and communicating directly therewith. Fitting loosely around the lower end of this male coupling is a female coupling *D* of a discharge spout *E*, having a nozzle *e*. Again, this female coupling has a lug *d*, pivoted to a lug *b'*, projecting laterally from the pipe *B*, the pivot *F* being so located as to afford an annular space *G* between said male and female members."

Frank A. Whiteley, of Minneapolis, Minn., for appellants.

Fred L. Chappell, of Kalamazoo, Mich., for appellees.

Before BAKER, MACK, and ALSCHULER, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). In single main track days tenders were supplied with water from tanks at the side of the right of way. A pipe projected horizontally from the tank near the bottom. Over the pipe was hinged a spout which normally stood upright. This spout could be pulled down and a valve operated to discharge water into the hole of a properly placed tender.

When double main tracks became common, inconvenience and delay resulted from taking water from the tank at one side of the tracks; and soon came the "railway water column." In this a water main led to a standpipe or column which was erected between the tracks; from the top of the column, at right angles, extended a rigid discharge spout which normally was parallel to the tracks; and the column could be rotated to swing the spout over either track.

Locomotives were being built larger and larger; on the same railway, tenders of various heights were in contemporaneous use; and for some years before Johnson devised his water column the variation amounted to five or six feet.

One condition of meeting perfectly the known situation was that the outer end of the spout should be movable up and down in a substantially vertical line above the water holes of tenders of varying heights. Other concurrent conditions were that the spout in its most elevated position should drain, when the valve in the column was

shut off, into the water hole of the tender, so as to avoid in winter the formation of ice heaps about the column between the tracks; and that the working relation between the column's nozzle and the discharge spout should be such that during the coldest weather the device would not be put out of commission by freezing.

Efforts, prior to Johnson's were along the following lines: One type had a ball and socket joint between the column nozzle and the spout. By providing a continuous waterway, the spout, inasmuch as its outer end in its normal position was above the head of the column, would drain back into the column. Thus the danger of ice heaps was avoided. But manifestly the outer end of the spout could move only in the arc of the circle of which the spout was the radius; and the overlapping parts of the ball and socket joint would become fast from freezing in very cold weather, putting the apparatus temporarily out of service, or causing it to be broken by forcible attempts at operation. In another form of the continuous waterway species the connection between the column nozzle and the spout was a flexible rubber tube, whose extensible accordion plaits permitted the outer end of the spout to be placed over the holes in tenders of varying height. Though this form prevented ice heaps about the base, the pockets in the plaits detained considerable water which when frozen rendered the device inoperable or caused the tube to be ruptured by impatient hands. In the Poage structure, pictured in the statement, we find that fewer of the difficulties were overcome than in the kinds in which there was a fixed and completely watertight connection between the column nozzle and the spout. Poage's is a modified form of the continuous waterway type. For, though Poage's specification speaks of a "loose" connection between the male and female members, the "annular space $G$" is slight in radial distance and limited in circumferential movement. It seems clear to us that "loosely" was used in the sense that the members were not affixed to each other and not completely watertight as in the ball and socket and accordion plait connections, and not in the sense in which a straight-sided funnel may be held "loosely" about the curved discharge end of a faucet. In operation, the annular space frequently became fast with ice; back pressure caused water to overflow through the annular space and form ice heaps about the base; the stop at bar $H$ (Figure 5) prevented the outer end of the spout from being raised to the level of the hinge $F$, which forms the center of the arc described by the outer end of the spout; and all movement of the outer end of the spout was down and away from the vertical plane in the center of the track. In Poage's modified form C, the male and female members were somewhat longer, but the principle of operation remained unchanged.

These prior art structures, in our judgment, emphasized the difficulties rather than indicated the solution. In Johnson's structure the co-operation of two new features is essential. One is the connection between the column nozzle and the spout. He made his nozzle in the form of an extended gooseneck, with a relatively flat downward curve. Over this he placed a spout whose rear portion, straight-lined, was of such diameter as to permit movement of the spout not directed or con-

trolled by the gooseneck nozzle. In this connective feature Johnson rejected ball and socket joints and accordion plaits, and likewise departed radically from the concentric and arc-ed movement of Poage's male and female members. The other feature is the extended arm, pivoted at one end to the column at a point approximately opposite the middle point of the range of movement of the end of the spout, and rigidly affixed at the other end to the sides of the spout. (In the prior art structures, from the earliest watertank to the latest water column, the spout itself was virtually the radius of the arc described by the end of the spout.) The first feature provides the capacity, and this second feature furnishes the means, of swinging the end of the spout in a substantially vertical line above the holes of tenders of varying height. This combination, resulting in a structure that substantially met all the difficulties, was novel. Each element, as such, was to be found somewhere or other in the mechanical world. And of course, in the light of the patent, other water columns may be, and for use in this case have been, altered and reconstructed to resemble the Johnson; but even with the aid of hindsight we fail to see in the patent anything other than a meritorious invention.

A large part of the record and briefs is taken up with matters which we have carefully examined, but which, we think, need no more than passing mention.

Appellees' insistence that the "vertical plane" of the claims is one that extends through the column and spout, and not the one that is drawn in the center of the track, results from a misreading of the patent.

Prolonged discussion of numerous photographs and measurements by opposing witnesses is presented concerning the character and dimensions of a water column erected by Johnson at Hayfield, Minn., about a year before he applied for his patent. Appellees' contention is that the Hayfield structure has a limit of accommodation of only a few inches, and not the "six feet or more" specified in the patent. Whether the Hayfield structure was a reduction to practice or an experimental use; whether its range of accommodation was less than that subsequently stated in the application for the patent; whether other water columns, also erected by Johnson prior to his application, as at Oelwein, Iowa, were perfect exemplifications of the patent; and what may be the truth respecting the methods of taking photographs and measurements —are questions we deem irrelevant. For this suit is based, not on Johnson's practices, but on his patent.

It is also claimed that the patent drawings, if scaled, do not exactly accord with the written description and the claims. But drawings are to be taken as illustrative of the idea of the patent, not as working plans. Western Telephone Co. v. American Electric Telephone Co., 131 Fed. 77, 65 C. C. A. 313.

[2] Regarding Foster's patent, appellees present the question of invention as though it would be obvious to a mechanic to change the rigidly attached ends of the Johnson arms into pivoted ends. Of course a mechanic could do that; but, if he did, the obvious result would be the inoperativeness of the Johnson structure. Johnson must have seen that obvious result, and therefore used the more expensive rigid

attachment; but neither to Johnson nor to others skilled in the art was it then obvious that all the aims and results of Johnson could be attained in a better way by pivoting the outer ends of the supporting arms. For that better way is impossible unless, as shown by Foster, the arms be pivoted near the inner end of the spout and between that point and the outer end of the spout additional supporting means be provided. After the desirability of the improvement and the means of accomplishing it were first perceived in the creative imagination, it was doubtlessly easy enough for Foster or any mechanic to go to the general art of pulleys, chains, counterweights, and arms or levers pivoted at both ends in various places, and gather the elements of the new combination. Though Foster's improvement is slight compared to Johnson's, we cannot find that the Patent Office was inadvertent in making the grant.

Appellees for a time manufactured and sold the Johnson water column under license. After paying something over $12,000 in royalties, they abrogated the contract. Their present manufacture is substantially the Johnson column, plus the Foster improvement, plus an improvement of their own.

We find the record sufficient to hold both appellees in this jurisdiction.

From an extended examination of the file wrappers we find nothing that detracts from the face value of either patent as issued.

Claim 11 of Johnson should not be included in the decree. Appellants, in response to interrogatories filed with appellees' answer, stated that they would rely at the trial only upon claims 1, 21, and 38. Without other notice, they included claim 11 in their evidence at the trial.

The decree is reversed, with direction to enter a decree for an injunction and an accounting.