**FAIRBANKS, MORSE & CO. et al. v. AMERICAN VALVE & METER CO. et al.**

**AMERICAN VALVE & METER CO. et al. v. FAIRBANKS, MORSE & CO. et al.**

Circuit Court of Appeals, Seventh Circuit.
July 18, 1929.

Rehearing Denied September 18, 1929.

Nos. 3776, 3782.

870

See, also, 31 F.(2d) 103; 276 U. S. 305, 48 S. Ct. 317, 72 L. Ed. 584.

Frank A. Whiteley, of Minneapolis, Minn., for plaintiffs.

Fred L. Chappell, of Kalamazoo, Mich., for defendants.

Before ALSCHULER and EVANS, Circuit Judges, and LINDLEY, District Judge.

ALSCHULER, Circuit Judge. Both parties (hereinafter called plaintiffs and defendants as in the District Court) appeal from a decree upon an accounting under finding of infringement of United States patent No. 818,968 to Johnson, 1906 (claims 1, 21, and 38), and No. 798,406 to Foster, 1905 (claim 1); the said claims of both patents having theretofore been held by this court to be valid and infringed. American Valve & Meter Co. et al. v. Fairbanks, Morse & Co. et al., (C. C. A.) 249 F. 234.

These appeals were before this court in 1926, and we then held that the transcript of the evidence did not comply with the requirements of Equity Rule 75b relating to the condensation and narration of the evidence, and we declined to consider such propositions as were dependent upon the evidence, and affirmed the decree of the District Court upon the accounting, save in some particulars not involving consideration of the evidence. 18 F.(2d) 716.

A writ of certiorari was granted by the Supreme Court "to enable it to review the ruling respecting the non-observance of the equity rule," and the decree of this court was reversed, and the cause remanded to this court for further proceedings in conformity with the opinion of the Supreme Court. 276 U. S. 305, 48 S. Ct. 317, 72 L. Ed. 584.

Thereupon a condensation of the evidence in narrative form was prepared, which was approved by the District Court and incorporated in the transcript.

All of the proceedings have reference to a type of standpipes for delivering water to locomotive tenders, known as Sheffield standpipe No. 11. Concurrently with some of these proceedings, plaintiffs instituted another action against Fairbanks, Morse & Co., charging it with infringement of the Johnson patent, and also of patent to Fenner, No. 782,496, February, 1905, by another structure known as Sheffield standpipe No. 12. This resulted in a decree holding Johnson infringed, and Fenner void. Upon appeal from so much of the decree as held Sheffield No. 12 to infringe Johnson, this court reversed the decree, with direction to dismiss the bill for want of equity. Fairbanks, Morse & Co. v. American Valve & Meter Co. et al. (C. C. A.) 31 F.(2d) 103.

In the original case, pursuant to the directions of this court, the District Court entered the usual decree for injunction and accounting, and the cause was referred to the master, before whom there was a long hearing, and complicated accounts submitted, mainly with a view to ascertaining the profits arising from manufacture and sale of Sheffield No. 11.

The master prepared a detailed report of his findings of fact and law, to which both parties filed objections, some of which the master allowed, with the result that he found

and recommended the recoverable profits to be $60,299.27, together with interest thereon, and found also that the plaintiff in the action had paid out to J. W. R. Bradford & Co., certified public accountants, for services in examining books and records of Fairbanks, Morse & Co., $12,606.74, and that such charge was fair and reasonable, and that plaintiffs were justified in employing the accountants to do that work.

Voluminous exceptions to the report of the master were filed by both sides, all of which were overruled, and a decree was entered March 8, 1926, requiring the defendants in the action to pay plaintiffs, as profits, $60,299.27, with interest thereon of $23,684.22, and $12,606.74 so paid out for accountant's fees, together with master's fees and costs.

1. Plaintiffs' appeal will first be considered. Their first assignment of error is "that the court erred in not finding that plaintiffs were entitled to recover the entire profits derived from the sale of 'complete standpipes,' amounting to $56,081.05." This arises out of the fact that the master did not allow the entire profit on sales of "complete standpipes." The profits allowed were upon that portion which is above the "lower upright," and not including the levers for operating the valve mechanism and rotating the pipe.

The master found that not all of the profits from the complete standpipe were due to the features embodied in the patents in suit. It seems that during the accounting period there were many sales of so-called "incomplete standpipes"—being that portion above and including the "extension joint." Such "incompletes" were purchased to be fitted upon structures already installed, which defendants or others had supplied. The parts below the "extension joint" consist of the "lower upright" and the elaborate valve mechanism for controlling the flow of water.

It requires but casual examination of the standpipe and the patents to conclude that the embodiment of the patents is to be found only above the "lower upright."

In Westinghouse Electric & Manufacturing Co. v. Wagner Electric & Manufacturing Co., 225 U. S. 604, 32 S. Ct. 691, 694, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653, it was held that, "Where a patent, though using old elements, gives the entire value to the combination, the plaintiff is entitled to recover all the profits."

This was followed by this court in Computing Scale Co. v. Toledo Computing Scale Co., 279 F. 648; and also by the Eighth Circuit Court of Appeals in Flat Slab Patents Co. v. Turner, 285 F. 257. But, where there are parts which do not involve or embody the patent, but to which a portion of the profits is reasonably attributable, a separation and apportionment of the profits, as between those parts which embody the patent and those which do not, should be made. Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U. S. 641, 35 S. Ct. 221, 59 L. Ed. 398.

The quite frequent sales by defendants of the portion only which embodied the patents —viz., the "incompletes"—not only emphasize the separability of this portion as a commercial entity, but also render the profit on such portion more readily ascertainable, as was in fact determined and found by the master. In determining the profit on sales of "completes" and "incompletes," the master adopted, as the basis for both, the rate of profit shown to have been realized on the sale of "incompletes." We regard this method as fair to both parties, and entirely unobjectionable.

2. Plaintiffs further insist that they should have been allowed the profits on repair parts furnished by defendants for the entire standpipe, and not have been limited by the master to the profits on repair parts for that portion above the "lower upright." What has been said respecting the claim of profits for the entire standpipe is applicable to this contention as well.

3. Plaintiffs complain of the master's computation of profits from the sale of 120 complete standpipes to the government, in 1917 and 1918, upon which the profits were estimated in the same manner as upon other sales of complete standpipes during that time; the contention being that sales to the government were at a price materially higher than charged to other purchasers of standpipes, and with correspondingly higher profit.

It appears that for these government sales the same method of ascertainment applicable to all sales for the year was adopted.

It sufficiently appears that the standpipes sold to the government were at considerably higher price than those sold to others, and defendants' own figures show that their profits on the government sales were considerably larger than on others. Defendants' figures show the profit on the government's standpipes to have been about $26 each; but, in estimating this profit, there is charged a selling cost of approximately $110 apiece, about 25 per cent. of the sales price. This would in any event be an extraordinarily large selling cost, but particularly for these government standpipes, which, as appears

from the account submitted by defendants, were all included in a single order number. If in selling to the government there was extraordinary expense, of amount and character not usually present in sales, the record does not disclose it, and we have no right to assume there was such. The selling cost basis generally adopted by the master in his ascertainment of profits was 5 per cent. of the selling price, which was also allowed in his computation on the government standpipes.

It seems clear to us that the basis adopted by the master does not sufficiently reflect the materially larger profits appearing to have been realized on the sale of the government's standpipes. Plaintiffs contend that, on the basis of the master's separation of the standpipe, this additional profit is $6,155.76, but in our judgment this is excessive.

Defendants kept no separate account of selling expenses attributable to standpipes, and, under all the circumstances, the exact profit is not ascertainable. We would not be inclined to disturb the master's conclusion, but for the fact that the basis employed was the profit upon sales of incomplete standpipes for the given year, in which the sales to the government were no factor, since the government bought only "completes."

Surely defendants' zeal in obtaining from the government materially larger prices and profits than they obtained from others should not be rewarded by permitting them to retain the excess. In our judgment, having due regard to the master's division between the infringing and noninfringing portions, and the profits he found to have been derived from all, on the basis of the sales of "incompletes," there should be a further allowance for profits on the sales to the government. Upon the master's computations the profits on the government sales were, for 1917, 96 standpipes at $38.55, or $3,700.80, and for 1918, 24 at $51.11, or $1,226.64, a total of $4,927.44. The government's sales were all at the same price, and, in our judgment, yielded a profit of not less than $65 each on the basis of the master's division—a total of $7,800. The difference of $2,872.56, plus interest on the same basis as adopted in the decree, should be added to plaintiffs' recovery.

■ 4. Plaintiffs contend that the recovery should not have been upon the basis of profits, but rather upon a reasonable royalty, which plaintiffs contend should be not less than 20 per cent., by way of damages, and that the amount of damages should be increased by statutory penalty because of defendants' calculated and willful infringement of the patents. While we believe it would much simplify such accountings, and minimize their usually intolerable burdens if a reasonable royalty could be the basis of recovery, instead of profits of the infringer, still, after the accounting proceeded to its conclusion upon the basis of profits, and decree on such basis made, it does not well become plaintiffs to urge that another basis be adopted.

Besides, plaintiffs introduced evidence of royalty agreements under the patents, or one of them, but did not disclose what royalties they actually received. Under all the circumstances, we cannot find that the master and the court erred in adopting profits as the basis of recovery.

5. Some other propositions are urged which we do not deem it necessary to discuss. Indeed, in the conclusion of plaintiffs' brief, filed in this court last April 29, it is stated:

"Plaintiffs believe that the report of the Master, confirmed by the District Court and reflected in the decree, should be affirmed in every particular excepting the two specially urged under Plaintiffs' Exceptions 3 and 4, to-wit, that the Plaintiffs should be allowed the repair profits earned on the main upright lower of the vertical standpipe as a part of a necessary element of the combinations appropriated and infringed; and that Plaintiffs should enjoy the same portion of profits made from the high-profit Government order that are awarded it on Defendants' other sales."

While this persuasively suggests plaintiffs' waiver of all other propositions, we have not so treated it.

■ 6. Respecting the contentions for defendants, we will not undertake to discuss every question raised or proposition urged, but only such as we deem of sufficient importance.

Upon adjudication of invalidity of the Fenner patent, defendants sought to reopen the accounting for consideration of the attributable profits from the infringing structures, in view of the structure of the Fenner patent being open to defendants under the decision of the court subsequent to the accounting, as made in the suit involving No. 12 standpipe. Defendants complain of the denial to them of the right to reopen the accounting on that ground.

We can see no substantial harm accruing to the defendants by reason of this denial which, in any event, was largely in the discretion of the court. If Fenner was open to the defendants, this did not give them the right to appropriate Johnson or Foster. Fenner was not in issue in the action out of which these appeals arise, and we can see no

reason for minimizing profits found and awarded because of the subsequent finding of the invalidity of Fenner.

Defendants contend that, with Fenner open to them, the "standard of comparison" rule applies, and that the recoverable profits would thereby be materially reduced. Sessions v. Romadka, 145 U. S. 29, 12 S. Ct. 799, 36 L. Ed. 609, is relied upon. We do not think the facts of that case are comparable with those here. The Johnson and Foster patents were of the very essence of the infringing commercial structure, and not "an inconsiderable part" thereof, as were the trunk fasteners in the Sessions Case, there held comparable to trunk straps as a standard of comparison. The facts of this case more nearly resemble those in Malleable Iron Range Co. v. Lee, 263 F. 896, wherein this court denied the application of the "standard of comparison" rule.

7. It is contended that no profit should have been allowed on about 60 standpipes which were delivered in Canada to Canadian Fairbanks, Morse & Co. The circumstances are unlike those in Larson v. Wrigley (C. C. A.) 20 F.(2d) 830, where there was a question of profits on infringing packages of gum manufactured and sold in Canada by a corporation there which, though subsidiary to the main defendant, was a separate entity, and was not a party to the action. Here defendant Sheffield Company made the standpipes which it sold to this Canadian corporation, and is clearly liable for its profits thereon. K. W. Ignition Co. v. Temco Electric Motor Co., 283 F. 873 (6 C. C. A.). The accounting does not include any profit on these standpipes beyond that received by the Sheffield Company.

There is no contention of impropriety in awarding against both defendants profits received by only one of them. Even though as to such items the two defendants may not be regarded as joint tort-feasors, and thus jointly liable, it appears that Fairbanks, Morse & Co. not only controlled and practically owned the Sheffield Company, but that during the pendency of these proceedings Sheffield Company was absorbed by and became part of the Fairbanks-Morse corporation.

8. Defendants maintain also that it was improper to measure the profits on the complete standpipes by the profits shown on sale of "incompletes." They contend that, in selling "incompletes," a relatively larger price is obtained than in selling the complete standpipe, and, indeed, that, while the sales of the "incompletes" showed a profit, in many instances the "completes" were sold at a loss. This position is difficult to understand, and we believe is not warranted by the record. The quite extensive sales of "incompletes" were possible because the part below the extension joint, with its valves, etc., was a separate entity, in that it would receive a superstructure which did or did not embody the Johnson or Foster patents. The "incompletes" cannot be considered as "repair parts," for which larger prices are quite generally exacted. The structure seems normally divisible, and, in view of defendants' failure to keep separate account of the profits attributable to the infringing part, after having its attention sharply challenged to plaintiffs' claim of infringement, it cannot insist on any fine line of demarcation of the profits.

Defendants' sales of "incompletes" did not, of course, purport to be made under the monopoly of these patents, but were made in defiance of them, and presumably no larger price was exacted because of these patents. We see no good reason for disturbing the basis adopted by the master.

In this connection we will say that the master's inclusion, with the "incompletes," of the "extension joint," is not properly subject to defendants' protest.

9. Defendants contend that, in any event, the accounting period should begin August 7, 1914, instead of the date adopted by the master, October 12, 1912. This contention, which involves a very considerable part of the recovery, grows out of a settlement agreement made on the first-named date between Johnson and Fairbanks-Morse, and the consequent dismissal of a suit theretofore brought by Johnson against Fairbanks-Morse. Under date of February 24, 1908, Johnson granted Fairbanks-Morse an exclusive license under his said patent, whereunder specified royalties were to be paid him. Under this license Fairbanks-Morse put out its Sheffield No. 10 as embodying Johnson's patent. These were sold in large numbers before the period here in question. While the contract was in force, and during the period here in dispute, Fairbanks-Morse gradually ceased making No. 10, and put out its Sheffield No. 11, but refused to pay royalty on No. 11, claiming that it did not embody Johnson's patent. Johnson filed a bill charging that Fairbanks-Morse failed to account for royalties upon Sheffield No. 10, and that they were putting out Sheffield No. 11, which was charged to embody the patent, and demanded an accounting under the license, and specific performance of the contract.

The parties thereupon negotiated a settlement of that controversy, and executed an agreement wherein it was specified that the license contract be canceled, and that $800 be paid for royalties due thereunder, and the suit dismissed. The settlement contract was dated August 7, 1914, when the suit was dismissed.

It is defendants' contention that this settled and cut off all liability to account under the Johnson patent, prior to the date of the dismissal.

While it is true that the Foster patent was not there in issue, if the settlement contract eliminates from the accounting all previous infringement under the Johnson patent, we think a re-reference of the cause would be necessary to state the account on the basis of liability for that period under the Foster patent alone.

Of the situation the master said in his report: "The facts in this record do not warrant the conclusion that it was the intention to include in the settlement in that case anything on account of the manufacture and sale of the No. 11 standpipe." From an examination of the somewhat scattered record, we are satisfied that this conclusion of the master is well founded. It appears that during the negotiations, and as a basis for fixing the amount of unpaid royalties, a report of the standpipes and repair parts made and sold was called for and rendered. This showed about 30 standpipes and a large number of repair parts, on all of which the contractual royalty was 5 per cent. of the sale price, or about $800.

When, however, in the present suit, Fairbanks-Morse filed its statement of No. 11 standpipes sold, there appears for the period between October 12, 1912, and August 7, 1914, over 250 No. 11 standpipes. If No. 11 standpipes were to have been included in the settlement contract this omission of over 200 standpipes from the report on which the settlement was made would have been a manifest fraud, which probably was not intended, but is reconcilable otherwise only on the assumption that No. 11 pipes were not in contemplation in the settlement negotiations and agreement.

This has quite conclusive corroboration in correspondence of attorneys for the respective parties very shortly preceding and in furtherance of the settlement, the reasonable purport of which is that No. 11 was not included, and that whether No. 11 infringed the Johnson patent would be for the patent lawyers thereafter to decide.

Defendants maintain that the settlement contract is clear, and that other evidence is not admissible to vary its terms. There is nothing in the settlement agreement purporting specifically to include the No. 11 standpipes, and these will not be inferentially swept into it if the evidence indicates they were not to be included. Surely the rule would not apply where an agreement of settlement was negotiated on the basis of data supplied by an accounting party, from which material facts were willfully omitted, to the injury of the opposite party and in fraud of his rights.

We would not be justified in limiting the accounting period more narrowly than as fixed by the master and carried into the decree.

■ 10. There was controversy respecting the master's conclusion respecting 13 standpipes sold by Fairbanks-Morse after the award of injunction upon the decree of infringement. It appears that these were delivered after the injunction, ten of them to the Great Northern railroad, and three to others; but plaintiffs contend they were its No. 12 pipe, which this court recently held not to infringe Johnson.

There was evidence that, when these standpipes were sent out, there were no links connecting the movable spout with the standpipe, and that they were equipped with the overhead arrangement for controlling the movement of the spout, as shown in (C. C. A.) 31 F.(2d) 103. The evidence showed that the orders had been given for No. 11 standpipes, and that the standpipes sent out were charged and carried in the seller's books as No. 11.

As to two of them, there was evidence that they had come to the buyer without the links, and with overhead construction as indicated, but that they did not work satisfactorily, and that the links were provided, some of them by "the manufacturer" (by which probably was meant Fairbanks-Morse).

There was evidence that the standpipes, as sent out, were provided with lugs cast thereon, as in No. 11, the purpose of which was to attach the links to the standpipe.

With such equipment, which seemed to invite the user to attach links if he preferred, it involves no undue straining to reach the conclusion that defendants were at least contributory infringers, and we are unwilling to disturb the finding of the master thereon.

■ 11. It is contended for defendants that the Bradford & Co. accountant's fee of $12,-606.74 should not have been allowed against

them. Plaintiffs maintain their right to have it stand as allowed by the master and awarded by the court. This item was directly in issue when we heard and decided the former appeal, and it was there considered, and passed upon. It was our conclusion that it should not have been allowed. Whether or not the reversal by the Supreme Court of the decree we then rendered leaves open this proposition, upon which the Supreme Court did not assume to pass, we do not undertake to say. But we see no reason to depart from the conclusion we reached, and we again hold that this item should not have been charged against defendants.

12. Shortly before the oral argument, defendants moved to dismiss plaintiffs' appeal on the ground that plaintiffs took no steps for review of the prior order of this court which affirmed the decree of the District Court (save as to the Bradford accountant's fee).

While the order of this court was in the form of affirmance, the court declined to pass on any questions depending on the evidence, because of noncompliance with Equity Rule 75b in preparation of the transcript, which was the same for both appeals.

The reversal by the Supreme Court on ground that opportunity should have been given by this court for supplying a proper transcript, and the subsequent filing of such transcript on behalf of both appellants, leaves open all questions which the evidence involved, notwithstanding defendants alone instituted the proceedings in the Supreme Court for review of our order of affirmance. The motion to dismiss plaintiffs' appeal is denied.

13. The decree of the District Court is in all respects approved, save as to the items of the further profit on sales to the government, and of the Bradford accountant's fee; and, for the purpose of making the decree conform to our conclusions respecting these items, it is ordered that the cause be remanded to the District Court, with direction to modify the decree by adding to the amount of plaintiffs' recovery the sum of $2,872.56 for the further profit on sales to the government, together with interest thereon at the rate and for the period fixed in the decree for computing interest upon profits, and by deducting from the amount of plaintiffs' recovery the item of $12,606.74, which is the amount included in the decree for the Bradford accountant's fee. As so modified, the decree will stand affirmed. Each party shall pay half of the costs of this court on both appeals.