## INTERNATIONAL VITAMIN CORPORA-
## TION v. E. R. SQUIBB & SONS.
### No. 272.

Circuit Court of Appeals, Second Circuit.
April 3, 1933.

Gifford, Scull & Burgess, of New York City (George F. Scull and Charles W. Mortimer, both of New York City, of counsel), for appellant.

Satterlee & Canfield, of New York City (Albert M. Austin, Ernest F. Staub, and Reuben T. Carlson, all of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is the usual suit in equity upon a patent for a process of extracting the vitamins from organic oils. The only issue is infringement. Vitamins are contained in the unsaponifiable parts of the oil, and the process is to extract these and the vitamins with them, by means of a solvent, leaving the bulk of the oil as soap. The art had progressed far in this direction, and the patented process was only for a more convenient method of extraction. The earlier practice was first to convert the saponifiable parts of the oil into soap by some alkali, as caustic soda or caustic potash, in the presence of water and alcohol. The soap mass was then dissolved in large quantities of water, to which was added alcohol to prevent emulsion. Last, the thin solution was treated with solvents, such as acetone, ether or benzol, to which the soap was immune, but which dissolved and extracted the unsaponified oil, the carrier of the vitamins. The extract was then treated in various ways not material, by which the vitamins could be recovered. This meth-od, however, resulted in an inconvenient bulk for treatment. The standard process of the pharmacopeia, for instance, prescribed the addition to the soap of twenty times its weight of aqueous alcohol, and though this was later reduced by one half by Steenbock, the process was still commercially awkward and expensive. Another process was that of Zucker, who made a sodium soap, which he dissolved in water, and then precipitated with calcium chloride. This precipitate he found to entrain the oil bearing vitamins, and from it, when drained and dried, he extracted by acetone the unsaponified oils which bore the vitamins. From this solution he thereafter extracted the vitamins by a complicated method. Even after being dried, Zucker's precipitate contained about 55% of water, though how much of this was entrained, and how much was dissolved in the calcium soap does not appear.

The patent disclosed a new solvent, ethylene dichloride, confessedly never used before for the purpose. Marcus tried to get claims for its use with any alkali soap to extract the unsaponifiable oils, but failed. We may not therefore regard the claims in suit as depending upon that feature alone; they are all for treating a "viscous-solid soap" with ethylene dichloride. That form of the soap is an essential element, and unless the defendant uses it with ethylene dichloride as an extractant, it does not infringe. Thus the controversy centres upon the meaning of the phrase. The specifications define it as "a soap mass that contains a substantial amount of water which, as it varies, changes the state of the soap from a soft semi-solid to a hard solid in contradistinction to a dry solid soap obtained by drying a soap mass." This refers to the process which is earlier disclosed, by which the oil is saponified "with an excess of about ten to fifteen per cent. of caustic potash in aqueous alcohol." The resulting "soap mass is adjusted so that about sixty grams of 30% aqueous alcohol is present for each 100 grams of oil saponified." This "mixture of potash soap" is the "viscous solid." The desired "adjustment" may be obtained in two ways; either by saponifying the oil "in the well known proportions, distilling off the excess alcohol * * * and then adding the required amount of water," or using "less alcohol than necessary to form a homogeneous solution of the reactive mixture * * * and then adding the required amount of water." In all the examples stated, the total quantity of water in the "viscous solid," is less than the original oil, and the fourth claim, not in suit on this appeal, speci-

fied the proportions. These are however omitted from the first three, which depend only upon conformity with the definition.

The defendant saponifies its oils by adding caustic soda, water and alcohol. At the completion of this step the soap contains 1.19 gallons of aqueous alcohol to one of oil, of which .19 is water. The percentages by weight do not appear. To this it adds 1.2 gallons of water, presumably a greater percentage by weight. The aqueous alcohol is therefore 2.39 to one of oil by volume, when the next step is taken. Thus, the mixture is not yet the "viscous solid" of the patent. Whether any of the water is dissolved in the soap in such a mixture, or whether all the soap is dissolved in the water, is not material. The defendant then heats the mixture and pours it into a solution of sodium chloride, ordinary brine. This the plaintiff claims to be the equivalent of distilling off the alcohol in Marcus's first method. "Salting out," that is, adding salt water to soap, was a well-known process; the only testimony is that it is an equivalent of distilling, and we agree; the question is as to the result. There is no chemical reaction between the brine and the solution of soap and water, but most of the alcohol passes into the brine, together with small amounts of glycerol and caustic soda. The soap floats on top and the brine is then drawn off. As in Zucker, the unsaponified oils, bearing the vitamins, are entrained in the soap, as is also some of the brine. All, or substantially all, the brine could be dried out, but the defendant does not so proceed. It drains the floating layers, till they contain 35% of soap, 12% of alcohol, and 50% of water, the remainder being made up of negligible substances. From this the defendant extracts the unsaponified oils with ethylene dichloride. The question is whether it is the "viscous solid soap" of the patent. If it is, the defendant infringes, for it makes no difference how it is produced; the claims describe it as a substance.

As already appears, the dissolved soap poured into the brine is a solution of aqueous alcohol and oil in proportion of more than two to one. What emerges is a mixture in which the proportions of aqueous alcohol to soap are roughly 62 to 35; obviously some of the water and most of the alcohol have been extracted. In gross consistency the two are very similar, except that the defendant's mixture is perceptibly granular when squeezed, and very noticeably flocculent before the brine has been withdrawn. The defendant insists that gross character is not the proper test; that the phrase, "viscous solid," must be applied to the curd proper, or particles of soap, and that the entrained brine must not be included. It says that its process is analogous to Zucker's, except for the irrelevant detail that his calcium chloride united chemically with the soap. Even after drying, his final precipitate also contains more than fifty per cent. of water; it is as much a "viscous solid" as Marcus's mixture.

There is no testimony that the brine removes water from the dissolved soap; the witnesses only speak of alcohol, glycerol and caustic soda. And yet the final proportions show that the mixture has in fact lost a large part of its water, even though we count in the entrained brine; and the defendant insists that the soap particles are substantially dry, merely embraced in the undrained brine. The evidence leaves at large the aqueous content of these soap particles; for aught that appears, it may be too little to conform to the definition of a "viscous solid soap." Water may be dissolved in the soap during saponification, for a solid may dissolve a liquid, curious as that seems. If any water is so dissolved, it does not appear what is the effect upon it when the large amount of water (1.2 gallons) is added before the mass is heated. The soap is then dissolved: presumably it loses the dissolved water, if any. When the mass is poured into the brine, it does not appear what is the aqueous content of the resulting precipitate, ignoring the entrained brine. The particles may be substantially free of water. If the defendant's interpretation be correct, it would be hard to find infringement.

On the other hand, if we abandon the defendant's test, based upon the particles alone, and consider the substance by its gross character, it seems to us that the defendant infringes. The substance treated by it with ethylene dichloride is not "dry solid soap" in any true sense; on the other hand it is not a watery solution. Moreover, variation in the amount of water present will change it from a "hard solid" to a "soft semi-solid" form. True, it will not do this by entering into solution with the soap, but only by further separating the particles, so that they slip past each other, giving a more viscous consistency to the whole. But it has the same gross character, if that is what the definition means. Between these two constructions of the patent we must choose.

The plaintiff supplemented its proofs by showing that only soaps made by its method and by the defendant's, did not emulsify, when used with ethylene dichloride. The defendant answers that the tests were ex

parte, produced upon the second day of a trial only three days long, and that courts are always suspicious of experiments made in such circumstances. Further, it argues that alcohol was a well-known corrective of emulsification. To the last it may be replied that even so, it may have been an advance in the art to secure a form of soap in which it was not necessary to avoid emulsification by means of added alcohol. To the first we may say that the defendant did not ask leave to repeat the experiments on its own account, and check their results. The whole issue is important, however, rather as to the value of the invention, than upon the issue of infringement to which we return.

It seems to us that the invention, both in letter and intent, has been taken. Possibly, the most important advance was the use of ethylene dichloride as an extractant, and that will not serve, not only because it was refused in the office, as we have said, but because it is of doubtful validity as an invention. Ethylene dichloride had become commercially a competitor with the other solvents only a short time before Marcus's application; its obvious advantages, lack of inflammability and toxicity, made it an almost certain subject of experiment, and indeed the defendant was in train for using it when it heard of Marcus's method. Nevertheless, Marcus used the soap in a new form, without chemical change. It may be true that the defendant descends from Zucker in the sense that it has availed of his discovery that the unsaponified oils are entrained in the soap when that is precipitated. But it did not use Zucker's method, because he had not thought of ethylene dichloride, even if his precipitate was "viscous solid," taken by its gross character. His patent did not therefore anticipate Marcus, even though Marcus was not the first to use a "viscous solid soap." Nor can we say that, though it was not invention to use ethylene dichloride upon any alkali soap, it was not such to use it with a "viscous solid soap," assuming Zucker had made one. It might be argued that if the use of ethylene dichloride as a substitute for other solvents was not invention, in the end somebody would have surely tried it with Zucker's soap, and would have corrected the emulsification with alcohol, if it does emulsify. But that by no means follows. Zucker's patent, so far as appears, was not strikingly successful; it involved an elaborate processing of the extract, which Marcus avoided. It was as likely to turn inventors aside from a "viscous solid" as to attract them to it; certainly there was nothing to lead them to use that part

alone of his idea, abandoning the rest. He may have indeed contributed a radically new discovery; the entrainment of the unsaponified oil with the soap. The defendant may have made an invention of its own out of that, but it does not matter if it did; we are concerned only with whether it was obvious that the form of the soap should be Zucker's if it was to be treated with ethylene chloride. We cannot agree that it was. To select that form as essential to the result, when ethylene dichloride was to be used, was something which a priori was not apparent. In chemistry, especially when the art has been striking at the mark, the first to hit does not usually do so by chance. All those engaged in such experiments are highly trained men, not ordinary routineers. A new and successful discovery is most unlikely to be the result of no more than everyday ingenuity. It seems to us that the proper test is to be found in a natural reading of the language, and that the claims can survive it.

Decree affirmed.