## INTERNATIONAL VITAMIN CORPORATION v. E. R. SQUIBB & SONS.

No. 5409.

District Court, E. D. New York.

Dec. 9, 1935.

See, also (D.C.) 59 F.(2d) 433.

Satterlee & Canfield, of New York City (Robert W. Byerly and Ernest F. Staub, both of New York City, of counsel), for plaintiff.

Gifford, Scull & Burgess, of New York City (George F. Scull and C. W. Mortimer, both of New York City, of counsel), for defendant.

GALSTON, District Judge.

Exceptions have been filed by the defendant to the report of the special master in which he finds that the defendant's profits from the infringement amount to $82,864.08, and plaintiff's damages, assessed on the basis of a reasonable royalty, to $70,965.06.

The suit is for infringement of letters patent No. 1,690,091, relating to a process for extracting vitamins or vitamin-bearing oils. The accounting filed by the defendant discloses that the only products manufactured by the defendant in which the infringing process was used were tablets sold under the name "Adex." The gross sales totaled $730,385.45; the net sales were $709,650.61. A deduction of $300,261.41 for factory costs left a gross profit of $409,389.20. Other items of deduction, which included selling and administrative expenses, packing and shipping, dealer participations, cash discounts, bad debts, royalties, research and advertising, aggregated $654,773.49, thus disclosing a net loss of $245,384.29, which loss, after giving credit for sales to a Canadian affiliate of the defendant, was reduced to $241,825.82.

The plaintiff excepted to two items of the defendant's account. The first, covering the manufacture of a batch of defective concentrates, amounted to $24,636.57; the second exception related to an advertising charge of $405,761.99.

The first sale of Adex tablets was made in November 1930, from a batch of concentrates begun in July, 1930. It appears that in November, 1929, the defendant employed the infringing process and produced a batch of concentrates which for one reason or another was not valuable for commercial purposes, and was not made up into tablets. Nevertheless, the defendants cannot charge the cost of manufacturing this first batch of concentrates against the price of the marketable concentrates manufactured six or seven months thereafter. The item was disallowed by the special master on the ground that the 1929 manufacture was separate and distinct from that of the marketable concentrates. It is reasonably clear that that is so. The first con-

centrates resulted from a 5,000 gallon batch. The material was found to be unstable, and the defendant could develop no way of stabilizing it. The experience thus gained led to a change in equipment and eventually to a change in the material used. The plaintiff's process, or rather the process of the patent in suit, was changed, in the words of one of the defendant's witnesses, "from the way in which it would not work to one in which it would." The exception relating to this item must, therefore, be overruled.

The master, following the plaintiff's contention, reduced the advertising deduction from $405,761.99 to the sum of $125,197.12. The question presented is one of considerable interest. That the defendant expended the entire sum as stated in the accounting filed is not contested. The plaintiff's theory, however, is that this sum, representing as it does 100 per cent. of the gross profits, is an unreasonable allocation and not justified by trade accounting practice. The plaintiff's theory is that the sum expended during the infringing period was not merely for the purpose of effecting sales during the current years of such advertising, but was designed to build up a basis for sales of Adex tablets in succeeding years.

That it is sound accountancy to regard the advertising expense in part as a deferred charge would seem to be supported by what is said in an article in the Journal of Accountancy, the issue of May–December, 1911, by Elijah W. Sells, entitled, "Should Advertising Expenditures Be Charged as an Investment or as an Expense?" The author writes:

"Generally speaking, such advertising as may be done for the purpose of bringing some new business or branch of business, some new or improved article or articles to the attention of the public, which has a direct effect in creating or measurably increasing the good will of a business undertaking, may be considered as an investment in that there has been an appreciable increase in the amount of capital employed; such advertising as may be done to maintain a normal distribution or to keep the name and nature of a business before the public or for the purpose of calling attention to special temporary prices of articles, while having some effect upon the good will of the business should not require further capital and should be provided for out of its current operations; in other words to be considered as an expense.

"Between the extremes, say of a newly started proprietary medicine business, the principal asset of which might be its advertising and an old established mutual assurance association with no asset of that nature, would fall all the other undertakings which advertise.

"Given the purposes and conditions of the advertising and in general policy of the management of an undertaking in regard to such expenditures, its correct classification as an investment or an expense is not difficult to determine."

A publication of the National Association of Advertisers and National Association of Cost Accountants, entitled, "An Analysis of Distribution Costs of 312 Manufacturers," shows that for the year 1931 the rate of advertising to net sales was 18.36. This was in the drug industry. The proofs show that the defendant, subsequent to the termination of the infringing period, derived substantial profits from the sale of Adex tablets, made by a noninfringing process. It is not contended that the expense of the noninfringing process was lower than that of the infringing process. It is, therefore, not unreasonable to conclude, as the master did, that there should be some apportionment of the advertising expense, and that the entire sum expended during the infringing period should not be permitted to stand as a deduction. Therefore, he accepted the calculation of the plaintiff's accountant, the basis of which calculation was the ratio of its entire advertising expense for all products other than Adex to its gross profit. This figure was 29.54 per cent., which accords with that prevailing in the drug industry. It must be conceded that if the defendant had done no advertising at all after the period of infringement the sale of its Adex tablets could have proceeded with the certainty that consumers would know the product; but for how long sales could have been carried on without a considerable loss in volume and without additional and continued advertising is wholly problematical, and there is no testimony adduced from which an answer can be arrived at. The period is indeterminable. There are no fixed determinants, and it would seem, therefore, that even expert accountants and specialists would be forced to enter the realm of speculation or conjecture to reach a re-

sult. The insuperable difficulty presented by the Scopp calculation is that it fails to present any method by which 70 per cent. of the sum expended during the infringing period for advertising, which 70 per cent. amounts to $280,564.87, is to be absorbed in future operations of the defendant's business. For example, in the Scopp revised operating statement, the apportioned advertising for 1930 is $2,470.19. The actual sum expended, according to the Squibb operating statement, was $8,205.72. No part of this balance is reflected in the Scopp advertising allowance for the year 1931 or 1932. Similarly the Scopp advertising apportionment for 1931 is $121,164.61, as against an actual expenditure by the defendant of $141,930.84, and no part of the balance is absorbed in the 1932 item. There is, therefore, no working formula suggested which is justified by any approved accounting system to demonstrate how the 70 per cent. balance will be absorbed in succeeding operations. To assert that all of it should be capitalized as the value of the trade-mark Adex is not in accord with any sound principle of accountancy; at least none developed in the record. I repeat, that defendant's advertising produced something valuable is undoubtedly true, but what that value is is a matter of conjecture. In Permutit Co. v. Refinite Co. (C.C.A.) 27 F.(2d) 695, 697, the court said: "Theoretically, it is true, advertising may be always regarded for a time as in part a deferred charge, even though the outlay was in the year considered, but any such allocation is purely speculative."

See, also, L. P. Larson, Jr., Co. v. William Wrigley, Jr. Co. (C.C.A.) 20 F.(2d) 830. Defendant's exceptions to the master's report relating to the apportionment of the advertising item must be sustained.

The result is that there is no proof of profits made by the defendant from the use of the infringing process. It thus becomes unnecessary to dispose of defendant's exceptions 5 and 6 which assert that the master erred in holding that the defendant's accounting as filed relieved the plaintiff of its legal burden of showing defendant's profits arising from the infringement by proving both the proper standard of comparison and the advantage of saving resulting from the infringing use. Mowry v. Whitney, 14 Wall. (81 U.S.) 620, 20 L.Ed. 860; Metallic Rubber Tire Co. v. Hartford Rubber Works Co. (C.C.A.) 275 F. 315; Empire Rubber & Tire Co. v. De Laski & Thropp Circular Woven Tire Co. (C.C.A.) 281 F. 1.

We now come to the question of plaintiff's damages. Fortunately for the plaintiff, this question presents no such difficulty as does the subject of defendant's profits.

It would seem entirely obvious that the sale by the defendant of tablets made by the infringing process, in excess of $700,000, took away from the plaintiff a considerable amount of business. How much is not determinable, for there were other manufacturers in the field competing with the plaintiff in the sale of vitamin products similar to those produced by the plaintiff's patented process. This situation calls then for the application of the reasonable royalty rule as annunciated in U. S. Frumentum Co. v. Lauhoff (C.C.A.) 216 F. 610; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 35 S.Ct. 221, 59 L. Ed. 398; Title 35, U.S.Code, § 70 (35 U.S. C.A. § 70). In W. S. Godwin Co. v. International Steel Tie Co. (C.C.A.) 29 F.(2d) 476, 478, Judge Denison wrote: "The District Court, finding that the plaintiff failed in this way to show either profits or damages, but that defendant had taken the invention and ought to pay for it, adopted the theory of reasonable royalty and fixed the amount at 10 per cent. of defendant's selling price. This was done in a manner that is called arbitrary; but this court has done it in substantially the same way, in order to end litigation and in cases where, at best, there could be nothing but an estimate. Clark v. Schieble (C.C.A.) 248 F. [276] 283; K. W. Ignition Co. v. Temco (C.C.A.) 283 F. 873; National Tube Co. v. Mark (C.C.A.) 10 F.(2d) 430, 432."

The master determined that a reasonable royalty in this case was 10 per cent. of the net sales. That the patented process is meritorious was determined by this court and by the Circuit Court of Appeals, International Vitamin Corp. v. E. R. Squibb & Sons, 64 F.(2d) 20. As was said by the Court of Appeals, "The art had progressed far in this direction, and the patented process was only for a more convenient method of extraction."

But the known processes were really laboratory methods only.

Referring to Steenbock's improvement in the pharmacopœia, the Court of Appeals characterized it as "still commercially awkward and expensive," and as to the

Zucker process, the court said: "Zucker's patent, so far as appears, was not strikingly successful; it involved an elaborate processing of the extract, which Marcus avoided. It was as likely to turn inventors aside from a 'viscous solid' as to attract them to it."

The evidence at the trial showed that the defendant had experimented with the Zucker process for two years, and nevertheless adopted the process of the patent in suit for commercial manufacture.

Marcus discovered a new solvent, ethylene dichloride. The value of that discovery is amply attested by the extensive commercial use thereof by both .plaintiff and defendant. A comparison of the relatively high sales prices of cod-liver oil and A vitamins on the market before the adoption of the Marcus process with the low prices of high potency A vitamins produced by the Marcus process, would lead to the reasonable conclusion that these prices bore some relation to the cost of manufacture and tend to show a saving by the defendant during the infringing period of a very substantial sum of money, greatly in excess of the reasonable royalty found by the master.

The Marcus process enabled the defendant to manufacture its Adex tablets at an average factory cost of $.30 per thousand A units. It thus made possible the manufacture of a vitamin product salable for $2.50 for a cost of $.30, or a factory profit of $2.20 per 100,000 A units, to take care of selling and all other overhead expenses. The royalty awarded by the master, therefore, would make less than $.08 per 100,000 A units.

In addition to this evidence, there was the testimony of plaintiff's expert, Dr. McKee, a professor of chemical engineering at Columbia University. Based on his knowledge of and experience in the licensing of chemical patents, including royalties on process inventions in the drug industry, he maintained that for a new product, commercially untried, royalties were from 5 to 7 per cent., but that as to inventions, the merit of which has been proved clinically and commercially, the royalties would be 10 per cent. of the total sales. Dr. McKee's qualifications included, of course, a particular knowledge of the Marcus process, for at the trial of the suit he had testified in support of the patent. Dr. McKee was better qualified to determine the amount of a reasonable royalty for the use of the Marcus process than either of the defendant's experts.

The defendant's exception to the finding that the royalty awarded by the master is calculated on the sale of Adex tablets, while the patent is for a process of making a concentrate used in production of that tablet, is without merit. The only reason for the making of the concentrate is the production of the tablet, and the only thing of value in the tablet to the consumer is the concentrate.

All the exceptions, therefore, relating to the award based on a reasonable royalty of 10 per cent., and amounting to $70,965.06, are overruled. Settle order on notice.